# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DUANE C. HARDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 7531-VCP |
| SHERRY L. HARDY and MICHAEL T. | ) | |
| HARDY, individually and as Trustees | ) | |
| of the Duane C. Hardy 2011 Trust, and | ) | |
| TOLMIROS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 16, 2014
Date Decided: July 29, 2014

William X. Moore, Esq., Edward H. Wilson, II, Esq., ROEBERG, MOORE & FRIEDMAN, P.A., Wilmington, Delaware; *Attorneys for Plaintiff Duane C. Hardy*.

Richard K. Goll, Esq., LAW FIRM OF RICHARD K. GOLL, Millville, Delaware; *Represented Defendants Sherry L. Hardy, Michael T. Hardy and Tolmiros, LLC at trial, but was permitted to withdraw as counsel on April 16, 2014*.

Sherry L. Hardy and Michael T. Hardy, *Pro Se Defendants*.


**PARSONS, Vice Chancellor.**

The plaintiff, Duane C. Hardy, received a large cash settlement as a member of the class that brought sexual abuse charges against the Catholic Diocese of Wilmington (the "Diocese"), among others. In anticipation of receiving his first settlement payment, the plaintiff, with the assistance of counsel, created a trust, naming himself as the beneficiary, and appointed his sister and nephew, Sherry L. Hardy and Michael T. Hardy, respectively, as co-trustees. The plaintiff's choice of trustees proved to be disastrous. This case arises out of the beneficiary's allegations that the trustees breached their fiduciary duties by engaging in self-interested transactions and failing to administer the trust for its intended purpose. By the time of trial, the trust accounts had a zero balance. Duane[1] seeks to recover losses the trust incurred as a result of the trustees' breaches of fiduciary duties. The relief he requests includes an award of money damages with prejudgment interest, the imposition of a constructive trust on items purchased with the trust corpus, and an award of his attorneys' fees and expenses.

In response, Sherry and Michael deny any liability, because, they allege, Duane consented to all or most of their self-interested transactions. In addition, the defendants contend that, even if they may have breached their fiduciary duty, they are absolved from any monetary damages by the exculpation clause of the Trust Agreement.

For the reasons stated in this post-trial opinion, I hold Sherry and Michael jointly and severally liable for their self-interested purchases and for many of the other

---

[1] Because the three main actors in this dispute have the same surname, *i.e.*, Hardy, I refer to them by their first names in the interest of brevity and clarity. No disrespect is intended.

1

expenditures the plaintiff challenged based on their failure to account for money withdrawn from the trust. I do not find the defendants liable for approximately $30,000 that was gifted to Duane's friends and family, allegedly at Duane's behest, and for certain of the other challenged expenditures. By way of relief, I award Duane money damages and I have imposed a constructive trust on the two vehicles the defendants purchased with trust assets and on Sherry's 8.3% property interest in a residence located at 412 W. 3rd Street, Wilmington, DE, 19801. Based on Sherry and Michael's breaches of their duties to the Trust, their egregious pre-litigation conduct, and certain actions taken vexatiously or in bad faith during the course of this litigation, I award Duane his attorneys' fees and expenses in connection with this litigation.

Finally, this Memorandum Opinion reflects my findings of fact and conclusions of law on Plaintiff's recently filed motions to set aside Michael's fraudulent transfer of one of the automobiles and for contempt. The defendants did not respond to these motions. Based primarily on my finding that the disputed transfer was fraudulent, I grant most of the relief sought by these two motions.

## I. BACKGROUND

### A. The Parties

Plaintiff, Duane, is the settlor and beneficiary of the Duane C. Hardy 2011 Trust (the "Trust").

Defendant Sherry and her son Michael are the co-trustees of the Trust (collectively, "Trustees" or "Defendants"). Sherry is Duane's older sister and Michael is Duane's nephew.

2

Defendant Tolmiros, LLC ("Tolmiros") was a business entity formed under the laws of Delaware on October 31, 2011. Michael established Tolmiros for the purpose of making investments, but it never engaged in any actual business transactions. The Court entered a default judgment against Tolmiros on January 16, 2013, due to Tolmiros's failure to obtain legal counsel as required under Delaware law.[2] The January 16 Order stated that a hearing on damages against Tolmiros would be scheduled to coincide with the trial on the merits against Defendants Sherry and Michael. No material evidence or argument was presented at trial on behalf of Tolmiros. Therefore, to the extent a money judgment or constructive trust is entered against Sherry or Michael, the Court also will award the same relief, jointly and severally, against Tolmiros.

## B. Facts[3]

### 1. Creation of the Trust

Duane was a party in a class action suit, which ultimately ended in a settlement, against the Diocese for abuse he endured as a child. Under the settlement, Duane was to receive an initial disbursement of $533,508.13, followed by two smaller disbursements. Before he received the funds, Duane, who suffers from bi-polar disorder and schizophrenia, and has struggled with drug and alcohol addiction, indicated to his

---

[2]  Scheduling Conference and Pl.'s Mot. for Default Judgment as to Def. Tolmiros, LLC and the Court's Ruling at 3, 6 (D.I. No. 103); *See Poore v. Fox Hollow Enters.*, 1994 WL 150872, at *2 (Del. Super. Mar. 29, 1994).

[3]  The facts recited herein constitute the Court's post-trial findings of fact. Unless otherwise noted, these facts are drawn from the stipulated facts section of the parties' Joint Pre–Trial Stipulation and Order, filed September 18, 2013.

3

attorney that to preserve his money, he wanted others to manage his settlement proceeds. Duane has stated that he drinks a six-pack of beer daily.[4] Duane also has only a ninth grade education.[5] On August 31, 2011, Duane created an irrevocable trust, the Duane C. Hardy 2011 Trust, of which he was both the Settlor and the Beneficiary. His older sister Sherry and her adult son Michael were appointed co-trustees of the Trust. At the time of the Trust's inception, an attorney explained to Defendants the duties and obligations required of them as trustees and reviewed with them the terms of the Trust.[6]

The stated purpose of the Trust was "to insure that . . . the physical necessities, comfort, happiness and best interests of the Beneficiary . . . be met."[7] The Trust Agreement states that the Beneficiary, Duane, "has a disability" and that the Grantor's wish was that "the Beneficiary attain the highest level of life satisfaction and achievement, consistent with the Beneficiary's disability."[8] In order to prevent the Trust from supplanting Duane's Social Security Disability Insurance income of $650.00 per month, the Trust Agreement provided that the Trust funds were to supplement any public

---

[4]   Tr. 196.

[5]   *Id*. at 171 (Duane).

[6]   Tr. 9–10 (Sherry); *id.* at 118 (Michael). Citations in this format are to the trial transcript. If the identity of the witness is not clear from the associated text, the witness's name is indicated parenthetically.

[7]   JX A at 1.

[8]   *Id.*

4

assistance Duane received.[9] Article 2 of the Trust Agreement further clarified that despite any language to the contrary within that agreement, "no trust or principal shall be paid to or expended for the benefit of the Beneficiary, so long as his care, comfort and welfare needs are adequately provided by programs designed to provide support needs to beneficiaries with disabilities . . . ."[10] The Trust Agreement provided the Trustees "sole and uncontrolled discretion" to "distribute or apply as much of the net income or principal of the Trust for the care, comfort, welfare, education or training of the Beneficiary," as the Trustees deemed to be in Duane's best interest.[11] Article 8 required the Trustees to "prepare an annual report of receipts and disbursements to the Beneficiary" and to make Trust records available for the Beneficiary's inspection at all reasonable times.[12]

Under an exculpation clause in Article 7, the Trustees are "not liable for any act or omission in the administration of the trust or for the loss or damage to trust property, except as caused by the Trustee's intentional misconduct or gross negligence."[13]

---

[9]     *Id.*

[10]    *Id.*

[11]    *Id.* at 2.

[12]    *Id.* at 6.

[13]    *Id.* at 5.

### 2. Rapid depletion of the accounts

#### a. Initial deposit in October

On October 27, 2011, Duane received the initial distribution of his settlement proceeds, totaling $345,676.88 after payment of attorney fees and costs. The next day Defendants deposited $336,676.88 of the funds into two separate accounts at Wilmington Saving Funds Society ("WSFS") —$172,838.44 into a money market account ("Account 1") and $163,838.44 into a high interest bearing checking account ("Account 2").[14] Notably, the initial deposits totaled $9,000 less than the amount of the settlement check. Defendants have provided varying accounts as to what happened to the $9,000. That question and the facts related to the disbursements made from the Trust accounts are discussed in the Analysis *infra*.

#### b. Payments to friends and family

The first significant withdrawals from the Trust accounts included a $15,000 check written out to cash on November 4, 2011, and a $21,700 debit withdrawal on November 8, 2011, for a total of $36,700.[15] Michael testified that, at Duane's behest, he gifted a majority of the $36,700 to various family members and friends of Duane.[16] According to several witnesses, Duane made a list of names and corresponding dollar amounts reflecting gifts he wished to give his family and friends from the settlement

---

[14] JX C at 1; JX E at 1.

[15] JX E at 1.

[16] Tr. 114.

6

proceeds.[17] Defendants did not attempt to put any list in evidence, but did provide copies of the cashier's checks given to each donee.[18] For his part, Duane denied making a list and maintained that he only authorized two payments in the nature of gifts, totaling $3,000.[19]

### c.      Sherry and Michael buy themselves cars

In the years preceding Duane's settlement, Sherry did not own a car.[20] At various times throughout his adult life, Duane was in prison.[21] During his most recent incarceration, Duane apparently wrote his sister Sherry a letter, dated September 23, 2009, updating her on his pending case against the Diocese.[22] After reminding Sherry to send him money, Duane concluded the letter by stating "I saw your car in the paper—Lincoln MKX. You desirve *[sic]* it sis[.] I hope you enjoy it."[23] Before he actually

---

[17]     Tr. 318–19 (Allen Hardy); *id.* at 258 (Shalon Hardy); *id.* at 303 (Rashon Hardy). [I found this testimony credible, even though Allen, Shalon, and Rashon each benefitted from gifts they received from the Trust. Tr. 318 (Allen); *id*. at 271-72 (Shalon); *id*. at 305 (Rashon)].

[18]     *See* JX L at 1–16.

[19]     Tr. 209–10 (Duane).

[20]     Tr. 22 (Sherry).

[21]     Tr. 205–06 (Duane).

[22]     JX X at 1. Duane denies having written this letter or causing it to be sent. Tr. 180.

[23]     *Id.*

7

received any money from the class action settlement, Duane told Sherry,[24] her daughter Shalon,[25] and others[26] that he expected to receive as much as $44 million in the settlement. Just over two years after he allegedly wrote the September 23, 2009 letter, Duane received his first settlement payment. Then, within two weeks of depositing the funds from the settlement into the Trust accounts, Sherry purchased a 2011 Lincoln MKX (the "Lincoln") for $49,920 with funds from the Trust. Relying on the 2009 letter, Sherry testified that Duane wanted her to have the vehicle.[27]

The Lincoln was titled to Tolmiros, a "financing" business Michael started shortly after he became a Trustee, and was Tolmiros's sole asset.[28] Michael described his business plan for Tolmiros as being to "look[] for rental properties that [he] could invest Duane's money in."[29] Michael also believed that a luxury car would attract potential investors for the now-defunct business.[30]

---

[24] Tr. 80 (Sherry).

[25] *Id.* at 257 (Shalon).

[26] *Id.* at 80 (Sherry).

[27] Tr. 21.

[28] *Id*. at 23–25 (Sherry).

[29] *Id*. at 120 (Michael).

[30] *Id.*

On the same day Sherry purchased the Lincoln, Michael bought himself a 2006 Mercedes Benz CL5 (the "Mercedes") for $33,120 and spent an additional $5,362.81 on an extended warranty. All of the money for these purchases came from the Trust.

By the end of November 2011, after Defendants had spent $83,402.81 on the Lincoln and the Mercedes, dispersed gifts to Duane's family and friends, and made various cash withdrawals, more than half of the original $345,676.88 was gone.[31] Only $162,033.63 remained in the Trust.[32]

### d. Renovating the 412 W. 3rd Street property

Duane and his sister Sherry each inherited from their mother an 8.3% interest in a property located at 412 W. 3rd Street, Wilmington, Delaware (the "Hardy Residence"). Both Defendants reside permanently in the Hardy Residence. Duane lived there on and off through the years. After his release from prison in June 2011, he returned to the Hardy Residence and remained there until approximately November 7, 2011, when Defendants moved Duane to an apartment in Newark, Delaware.[33] Sherry and Michael spent approximately $2,500 from the Trust furnishing that apartment.[34]

In late November 2011, after Duane moved to Newark, Defendants began a major renovation project at the Hardy Residence. Ultimately, Sherry and Michael spent over

---

[31] JX C at 3; JX E at 7.

[32] JX C at 3; JX E at 7.

[33] JX H at 2.

[34] *Id.* at 4.

9

$75,000.00 on various upgrades and repairs.[35] Among other things, they purchased all new appliances for the house and installed granite counter tops in the kitchen.[36] When questioned at her deposition about the renovation expenditures, Sherry stated that Duane gave her permission to use Trust funds to pay them, because it would have made his mother "proud to see the house fixed."[37] Michael considered the renovation a good investment for Duane. He apparently believed that using Duane's Trust to fund the improvements would somehow increase Duane's 8.3% ownership interest.[38]

### e.  Duane signs the Consent Document

At some point in December 2011, people close to Duane began to express concerns regarding Sherry and Michael's spending habits.[39] In order to "cover [themselves] just in case somebody would try to sue [them] outside of Duane,"[40] Defendants drafted a document (the "Consent Document") for Duane's signature that

---

[35]  Tr. 33–34 (Sherry).

[36]  JX N at 1–2.

[37]  JX K at 58 (Sherry's Dep.).

[38]  JX P at 27.

[39]  Tr. 151 (Michael).

[40]  Tr. 153.

effectively would give Defendants *carte blanche* to use the Trust funds any way they wanted.[41] The document states as follows:

> I, Duane Hardy, gave Michael Hardy and Sherry Hardy[,] my trustees[,] the consent to use my trust fund to buy new and used cars for business and personal use. Also to repair 412 W. 3rd Street, Sherry Hardy's home, as much funds as possible to complete the task. Duane Hardy has also gave [*sic*] the consent to Michael Hardy and Sherry Hardy to use Duane Hardy's trust funds for any other personal uses.[42]

Sherry and Michael took Duane to have the Consent Document notarized on December 20, 2011, at which point the Trust held $106,972.97. By the end of December, $93,972.97 remained.[43]

### f. Defendants close the original accounts and open new ones

Shortly after signing the Consent Document, Duane received further warnings regarding Sherry and Michael's spending.[44] Frustrated that Defendants had yet to provide him with any Trust records or account statements despite his repeated requests, Duane visited a local WSFS branch and obtained account information directly from a bank teller.[45] Seemingly in response, on January 19, 2012, Defendants withdrew the

---

[41] Sherry testified that the document was intended to protect Duane from "greedy family members," Tr. 65, but I do not find her testimony credible. By its terms, the Consent Document purports to protect only Defendants themselves.

[42] JX U at 1.

[43] JX C at 6; JX E at 11.

[44] Tr. 176–77 (Duane).

[45] *Id*. at 177.

entire balances of Account 1, $64,536.16, and Account 2, $4,201.12,[46] and deposited the money in two new accounts at WSFS ("Account 3" and "Account 4," respectively). After the transfer, Defendants continued to draw from the accounts, by, for example, making out sizeable checks to cash. There is no evidence however, that Defendants advised Duane about the existence or status of the new accounts. By the end of January, 2012, Accounts 3 and 4 had a combined balance of $56,277.25.[47]

In a further attempt to conceal the status of the Trust accounts, on February 8, 2012, Sherry sent to Jacobs and Crumplar, P.A., the law firm that handled the lawsuit against the Diocese and helped create Duane's Trust, a letter requesting that only members of the firm, the co-trustees, and their attorneys receive information about the Trust.[48] Sherry further requested that Jacobs and Crumplar "not follow the directions of Mr. Duane C. Hardy, his lawyer, or anyone who holds Mr. Hardy's power of attorney."[49]

### 3. The continued dissipation of the Trust

On February 28, 2012, when only $34,385.58 remained in the Trust,[50] Duane filed a complaint against Defendants in this Court alleging a breach of trust through intentional

---

[46] JX C at 9; JX E at 14.

[47] JX D at 1; JX F at 1.

[48] JX I at 1. Duane was not copied on the letter.

[49] *Id.*

[50] JX D at 5; JX F at 2.

misconduct and gross negligence.[51]  Two days after Michael and Sherry formally were served, Michael signed and had notarized a written statement in which he promised: (1) to show Duane bank statements at Duane's request; and (2) to purchase Duane a vehicle.[52]  On March 15, 2012, Duane dismissed his complaint without prejudice.[53]

Undeterred by the threat of litigation, Defendants continued to withdraw large amounts of money from the Trust.[54]  Defendants' recordkeeping system, or lack thereof, however, makes it difficult to determine how most of the remaining Trust funds were spent.  Defendants claim to have kept receipts for some of the purchases they made, but the only consistent records reflecting disbursement of Trust funds were the actual bank statements.  Unfortunately, those statements generally do not show what the money was spent for or to whom it was paid.  The bank statements do show, however, that the account balance declined precipitously and, by the end of March, only $3,654, or roughly 1% of the original deposit into the Trust, remained.[55]  Thus, in a period of only five months, virtually all of Duane's settlement with the Diocese was gone.

---

[51]  Verified Compl. ¶ 4, *Hardy v. Hardy*, No. 7288-ML (Del. Ch. dismissed Mar. 15, 2012).

[52]  JX W at 1.

[53]  Notice of Dismissal, *Hardy v. Hardy*, No. 7288-ML (Del. Ch. dismissed Mar. 15, 2012).

[54]  JX D at 6; JX F at 7.

[55]  JX D at 5, 7.

13

## 4. The receipt book

With only a negligible balance remaining in the Trust and facing the possibility that Defendants would have access to the funds from the two smaller settlement distributions, totaling $30,118.54,[56] Duane initiated this action by filing another complaint against his sister and nephew on May 15, 2012. During their depositions on August 7, 2012, Duane's counsel questioned Sherry and Michael regarding their recordkeeping for the Trust. Neither Defendant could identify any specific procedure they had implemented for documenting Trust expenditures.[57] In fact, both Defendants seemed unsure about whether any records existed, and said they would have to go home and look.[58] For example, Sherry testified as follows:

> Q: So you didn't keep track of where the money went?
> A: Sometimes I did and sometimes I didn't.
> Q: Well, when you did, how did you do that?
> A: I may have written it down. I'm not sure.
> Q: So, is what you are telling me, you don't know if you did or didn't keep track of where the money went.
> A: I probably did.[59]

Michael gave similarly ambiguous and vague responses.

> Q: Do you have any sort of records of the trust expenditures?
> A: Possibly.

---

[56]  JX J at 1–2.

[57]  JX K at 44–45 (Sherry's Dep.); JX P at 24–25 (Michael's Dep.).

[58]  JX K at 44–46; JX P at 24–25.

[59]  JX K at 46.

> Q: Okay. Where do you think that might be?
>
> A: I would have to look around.[60]

On January 22, 2013, Duane's counsel served a Request for Production, seeking "copies of all financial records maintained by trustees, but not limited to accounting books, spreadsheets, checking account balances, and other related documents indicating withdrawals and deposits from the Duane C. Hardy 2011 Trust."[61] Yet, Sherry and Michael failed to turn over any additional records in response to that request.[62] On May 1, 2013, the Court granted Motion to Compel by Plaintiff and ordered Defendants to respond within five days. Once again, Sherry and Michael failed to produce any records. On August 5, 2013, Plaintiff filed a second Motion to Compel. The Court also granted that motion and imposed a deadline of September 4, 2013 for Defendants to produce any responsive documents or be barred from introducing or referencing any documents not produced by the deadline. On September 4, Defendants produced to Plaintiff's counsel copies of numerous receipts from an alleged receipt book.[63]

Several characteristics of the receipts Defendants produced, however, raise questions about their authenticity and reliability. First, neither Defendant mentioned the

---

[60]   JX P at 24–25.

[61]   Pl.'s Mot. to Compel Ex. A (D.I. No. 66).

[62]   Plaintiff filed his first Motion to Compel on February 20, 2013. Shortly thereafter, Defendants hand-delivered a response to the Second Request for Production, which stated, "We do not have all of the documents requested." Pl.'s Post-Trial Opening Br. 21.

[63]   Although Sherry testified that the receipts Defendants produced came from a receipt book, Defendants never produced the receipt book itself. Tr. 38.

15

receipts during their deposition, despite specific questions regarding trust recordkeeping. Second, although, the receipts presumably were bound in a book initially, no book or portion of a book was produced. Third, the receipts bear preprinted numbers and have blanks to fill in information about the expenditure, including the date. Yet, when the receipts Defendants produced are placed in sequential order based on the receipt number, the handwritten dates on the receipts are not in order. For example, receipt number 465809 is dated November 9, 2011, but the immediately preceding receipt number 465808 is dated April 24, 2012.[64] Even receipts bearing the same date are not in consecutive order; instead, they are spread throughout the receipt number sequence.[65]

In addition, the compilation of receipts contains instances where the receipts suggest that, on the same day, Duane received multiple disbursements of the same amount of money. For example, on March 28, 2012, the receipts show that Duane received three separate payments of $1,225.[66] When the corresponding receipts are arranged in receipt number order, they are: 465831, 465801, and 465854. Furthermore, the bank records indicate that on March 28, 2012, there were two, rather than three,

---

[64]     JX Z at 9–10.

[65]     JX Z at 38, 67 (February 7, 2012); JX Z at 9, 27 (April 24, 2012).

[66]     JX Z at 6, 24, 46.

separate withdrawals from the Trust accounts in the amount of $1,225.[67]  Lastly, Duane's

signature on each of the receipts varies greatly throughout the receipt compilation.[68]

### C.     Procedural History

Duane's May 15, 2012 complaint (the "Complaint") accused Sherry and Michael

of breach of trust through intentional misconduct and gross negligence and asserted a

claim against Tolmiros, LLC for unjust enrichment.   The Trustees and Tolmiros

answered on June 27, 2012.  On January 15, 2013, Plaintiff moved for default judgment

against Tolmiros.   The Court granted that motion on January 16, 2013, and ordered

Tolmiros to assign title of the Lincoln to Plaintiff's attorney within seven days.  On the

same day, January 16, however, Plaintiff learned that Tolmiros had transferred title of the

Lincoln to Sherry the day before.  Duane then moved to set aside the transfer of the

Lincoln to Sherry based on the Delaware Uniform Fraudulent Transfer Act.[69]  On January

29, 2013, after hearing argument, the Court granted the motion to set aside the fraudulent

transfer.

The parties actively engaged in discovery in the latter part of 2012 and much of

2013.  As mentioned *supra*, that included two motions to compel by Plaintiff.  The Court

---

[67]     *See* JX D at 6; JX F at 5.  There are also other instances in which the receipts do not align with the bank statements.  For example, the receipts indicate that on April 3, 2012, Defendants gave Duane three separate payments of $1,000.  JX Z at 7, 25, 54.  Yet, the bank statements indicate only two separate $1,000 withdrawals on April 4.  JX F at 5.  *See also* Pl.'s Post-Trial Opening Br. 24 for additional examples.

[68]     *See* JX Z at 1–71.

[69]     6 *Del. C.* §§ 1301–1311.

held a two-day trial on the merits of this action on October 14 and 15, 2013. Duane and Defendants submitted post-trial briefs, and on April 16, 2014, the Court heard post-trial oral argument. By the time of the argument, Duane's counsel had learned that Michael had transferred title to the Mercedes to a third party, in apparent violation of the Court's January 29, 2013[70] and October 15, 2013[71] Orders, reflected in transcript rulings prohibiting the undisclosed transfer or conveyance by Defendants of any asset purchased with funds from the Trust. On April 22, 2014, Plaintiff filed a motion for contempt and a motion to set aside Michael's conveyance of the Mercedes as fraudulent. Defendant never responded to those motions. This Memorandum Opinion constitutes my post-trial findings of fact and conclusions of law on the issues presented at trial and my rulings on the motions for contempt and to set aside the conveyance.

### D. Parties' Contentions

Duane contends that Defendants, in their role as trustees, breached their fiduciary duties by engaging in self-interested transactions, failing to administer the trust for its intended purpose, and failing to maintain adequate records or to inform Duane of all material facts relating to expenditures made from the trust. Duane seeks money damages against Defendants and the imposition of a constructive trust over the Lincoln, the Mercedes, and Sherry's 8.3% interest in the Hardy Residence, among other things.

---

[70]  Scheduling Conference and Pl.'s Mot. for Default Judgment as to Def. Tolmiros, LLC and the Court's Ruling at 9-10 (D.I. No. 103).

[71]  Tr. 347.

18

Additionally, Duane requests that the Court remove Defendants as trustees and appoint a professional trustee to manage the remainder of the Trust.

Defendants maintain that they did not breach any fiduciary duties owed to Duane because Duane knew of and consented to most of their self-interested purchases. While Defendants admit that they could have kept more accurate and complete records,[72] they insist that they regularly informed Duane of how they used the Trust funds and assert that they did not provide Duane with bank statements in order to protect him from outside influences.

## II.    ANALYSIS

### A.    The Trustees' self-interested transactions

#### 1.    The legal standard

Inherent in the trust relationship is the duty of loyalty, which requires a trustee to administer the trust solely for the interest of the beneficiary and exclude all selfish interests and all consideration of the interests of third persons.[73]  Self-interested transactions by fiduciaries are not prohibited altogether, but require the beneficiary's voluntary consent to the transaction after full disclosure.[74]  Under Delaware law, when a fiduciary has a close confidential relationship with the beneficiary, such consent requires

---

[72]    Defs.' Post-Trial Br. 7.

[73]    George Gleason Bogert, *The Law of Trusts and Trustees*, § 543, at 217–18 (2d rev. ed. 1993).

[74]    *Estate of Carpenter v. Dineen*, 2008 WL 859309, at *12 (Del. Ch. Mar. 26, 2008).

19

impartial advice from a competent and disinterested third person, sufficient to allow the beneficiary to make an informed decision.[75]

Self-interested transactions involving a fiduciary or one in a confidential relationship with another are presumptively fraudulent[76] and voidable in equity.[77] "[I]f the transaction is challenged, the burden of persuasion to justify upholding the transaction is on the fiduciary. 'That burden is even greater where the transfer of property is made without consideration.'"[78]

### 2.   Sherry and Michael breached the duty of loyalty

#### a.   The Lincoln and the Mercedes

Sherry and Michael's automobile purchases were self-interested transactions, which benefitted Defendants at Duane's expense. As self-interested transactions, they are presumptively voidable. To overcome the presumptive invalidity of the transactions, Defendants argue that Duane consented to and even encouraged the purchases, offering the notarized Consent Document as proof. Duane's written consent is ineffective in the circumstances of this case, however, for at least two reasons. First, Sherry and Michael have not shown that Duane received any material consideration in exchange for the use of his Trust fund to buy the two automobiles. In addition, Sherry and Michael failed to

---

[75]   *Schock v. Nash*, 732 A.2d 217, 229 (Del. 1999); *see also Dorman v. Plummer*, 2001 WL 32645, at *5 (Del. Ch. Jan. 9, 2001).

[76]   *Peyton v. William C. Peyton Corp.*, 7 A.2d 737, 746–47 (Del. 1939).

[77]   *Estate of Carpenter*, 2008 WL 859309, at *12.

[78]   *Id.*

prove that Duane was fully informed as to the state of his Trust, the cost of the Lincoln and Mercedes, and other relevant facts before he allegedly consented to those purchases.

Second, Sherry and Michael had a confidential relationship with Duane. "A confidential relationship exists where 'circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed.'"[79] In determining whether a confidential relationship exists, this Court has considered factors such as "reliance on another for physical, emotional, or decisional support, a query informed by the beneficiary's disposition and mental and physical capabilities, as well the existence and extent of any additional support network. Kinship by blood or marriage is also a factor, but is not itself determinative."[80]

Several factors in this case suggest that in addition to the formally recognized fiduciary relationship between Defendants and Duane, as Trustees and Beneficiary, a confidential relationship existed as well. Defendants are blood relatives of Duane. Sherry is his older sister, and Michael is his nephew. Sherry and Michael also assisted Duane in various ways, such as taking him shopping, helping him get his own apartment, and occasionally providing transportation. Michael testified that "[Sherry and I] would

---

[79]     *In re Will of Wiltbank*, 2005 WL 2810725, at *6 (Del. Ch. Oct. 18, 2005) (quoting *In re Will of Szewzcyk*, 2001 WL 456448, at *5 (Del. Ch. Apr. 26, 2001)).

[80]     *Mitchell v. Reynolds*, 2009 WL 132881, at *9 (Del. Ch. Jan. 6, 2009).

drop whatever we were doing and we would make sure he was okay,"[81] which confirms

Duane's reliance on Defendants. In addition, Defendants' willingness to assume the role

of Duane's caretakers, in light of Duane's mental illness and struggles with substance

abuse, put them in a "relatively superior position"[82] with respect to Duane. In fact, the

Trust Agreement signed by Duane, Sherry, and Michael at a time when Duane had the

benefit of impartial advice from a competent and disinterested third person acknowledges

that Duane has a "disability," and describes the Trust's purpose and intent as follows:

> By this trust, Grantor [Duane] intends to insure that, to the best extent possible, the physical necessities, comfort, happiness and best interests of Beneficiary [Duane] will be met. It is the Grantor's wish that the Beneficiary attain the highest level of life satisfaction and achievement, *consistent with the Beneficiary's disability*.[83]

In contrast, nothing in the Trust Agreement authorizes Defendants, as Trustees, to

engage in self-interested transactions. Therefore, I find that Sherry and Michael had a

confidential, fiduciary relationship with Duane at all times relevant to this litigation. This

conclusion is buttressed by the fact that the Trust is designated as a Spendthrift Trust.

Specifically, Article 6A, entitled "Spendthrift Clause" states: "No Beneficiary will be

allowed to assign, transfer (voluntarily or involuntarily), pledge or anticipate any interest

in income or principal held or payable, and no Beneficiary's creditors (including a spouse

---

[81]    Tr. 159 (Michael).

[82]    *Swain v. Moore*, 71 A.2d 264, 267 (Del. Ch. Feb. 7, 1950).

[83]    JX A at 1 (emphasis added).

or former spouse of the Beneficiary) will be allowed to attach or otherwise reach any such interest."[84] This clause in the Trust Agreement suggests that, at a minimum, Duane's ability to consent to the Trustee's making self-interested gifts or payments to themselves would be limited. As previously noted, Duane was disabled in that he suffered from bi-polar disorder and schizophrenia and has struggled with drug and alcohol addiction.

Because the Court finds the existence of a confidential relationship, Sherry and Michael's automobile purchases are presumed fraudulent, and therefore voidable, absent proof that Duane consented to those transactions by signing the Consent Document or otherwise after he received impartial advice from a competent and disinterested third party. Sherry and Michael presented no evidence that Duane received such impartial advice. Therefore, as to their respective purchases of the Lincoln and the Mercedes, I find that Sherry and Michael breached their duty of loyalty.[85]

In arguing that Duane did give his informed consent to the purchase of the two automobiles, Defendants rely most heavily on the notarized Consent Document signed on or about December 20, 2011. First, I note that there is no evidence that Duane received any impartial advice from a competent and disinterested third party in connection with

---

[84] *Id.* at 3.

[85] Whether Defendants can be held personally liable for these and the other alleged breaches of duty discussed in this Memorandum Opinion depends on whether their conduct is exculpated under the Trust Agreement. I address that issue in Section II. E *infra*.

23

his signing that document. The record indicates that he dealt only with Sherry and Michael in that regard, and they both were interested in that consent because it purported to ratify and facilitate their engaging in self-interested transactions. For that reason alone, the Consent Document is ineffectuated. Even if impartial advice were not needed in this instance, however, I still do not find that the Consent Document constitutes credible evidence that Duane gave his informed and voluntary consent to, for example, Defendants' use of Trust funds to purchase the Lincoln and the Mercedes.

As Trustees, Defendants had to obtain Duane's fully informed consent regarding the automobile purchases. Section 97 of the Restatement of Trusts provides in relevant part that:

> "A beneficiary who consented to or ratified, or released the trustee from liability for, an act or omission that constitutes a breach of trust cannot hold the trustee liable for that breach provided . . . the beneficiary (or the beneficiary's representative), at the time of the consent, ratification, or release, was aware of the beneficiary's rights and of all material facts and implications that the trustee knew or should have known relating to the matter . . . ."[86]

In this case, Defendants presented no credible evidence that Duane ever received such full disclosure.

### b. The Renovations to the Hardy Residence

The use of the Trust to pay for various renovations to the Hardy Residence are also self-interested transactions, because Duane no longer lived at the residence and

---

[86] Restatement (Third) of Trusts § 97 (2012).

Sherry and Michael directly benefitted from the transactions. Accordingly, to meet the requirements of the duty of loyalty and overcome the presumption that all transactions related to the Hardy Residence renovations were invalid, Sherry and Michael, as Trustees, had to prove that Duane voluntarily consented to the transactions after full disclosure. Because Sherry and Michael had a close confidential relationship with Duane as related to the Trust fund, they also had to prove that he received competent and impartial, third-party advice. Again, Sherry and Michael failed to produce any persuasive evidence on either of these issues. Therefore, I find that, as to the money spent on repairs to the Hardy Residence, Defendants breached their duty of loyalty.

### B. Gifts to family and friends

During their tenure as Trustees, Sherry and Michael gave money to Duane's friends and family members, allegedly at Duane's behest, and they now have provided documentation purporting to show that $30,200 of the Trust was allocated to these gifts. Duane insists that he only instructed Sherry and Michael to give monetary gifts to two of his friends, Mr. Sal and Harold Gregory, amounting to a total of $3,000.[87] Duane specifically denied authorizing such gifts to anyone else.[88]

Trust principles allow Duane, as beneficiary, to transfer his interests in the Trust, absent any trust provisions to the contrary.[89] Fiduciaries owe Duane, as beneficiary, not

---

[87] Tr. 208.

[88] *Id*.

[89] *See* Restatement (Second) of Trusts § 132 (1959).

25

only a duty of loyalty, as previously discussed, but also a duty to exercise due care.[90] That is, Sherry and Michael have a duty to administer the trust with "the skill and care that a man of ordinary prudence would exercise in dealing with his own property in light of the situation existing at the time."[91] The Trust Agreement for Duane's Trust gives broad discretion to the Trustees. The only limitation on Defendants' authority to effectuate gratuitous transfers to third parties at Duane's request relevant in this case is their fiduciary duty of care.

The ultimate issue as to whether Defendants breached their duty of care regarding the gifts is whether Duane directed the transactions, as Defendants maintain, or whether Sherry and Michael gave the money away on their own volition, as Duane asserts. The Court evaluates such a claim using a preponderance of the evidence standard.[92] In support of this aspect of his Complaint, the only limitations on discretion relied upon by Duane were the requirements that the Trust be administrated for Duane's benefit and that the Trustees comply with their duty of care.[93] As Plaintiff, Duane bears the burden of proof and must show by a preponderance of the evidence that he is entitled to relief.

---

[90] *Wilmington Trust Co. v. Coulter*, 200 A.2d 441, 448 (Del. 1964).

[91] *Id.*

[92] *Estate of Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009).

[93] Duane does not allege or argue that the Trustees' actions with respect to the gifts were self-interested, even though a number of the donees are blood relatives of Sherry and Michael. That may be because those same individuals are blood relatives of Duane, as well, and natural objects of Duane's bounty. In any event, because the transactions have not been challenged as self-interested, they are not

26

To resolve the conflicting evidence regarding the disputed gifts, the Court must evaluate Duane's credibility as a witness. Based on his testimony at trial, I do not consider Duane a particularly reliable witness. There is no dispute as to his being diagnosed with bipolar disorder and schizophrenia. In addition, he currently has an addiction to alcohol; he admittedly drinks, on average, at least a six pack of beer a day.[94] In some respects, Duane fell back on his alcohol addiction as a crutch or excuse for providing unhelpful or evasive testimony. In certain other respects, however, Duane's testimony was coherent and credible. One example involved his efforts to gain access to his bank records from Defendants and from WSFS. In yet other instances, Duane's answers were so absolute and unqualified that they strained credulity. In that regard, I find not credible Duane's denial that he ever visited the Hardy Residence after he was moved to the Studio Green apartments in Newark, Delaware, especially because several other witnesses testified to the contrary. When asked whether he had visited 412 West 3d Street at any time in the two and one-half years before trial, for example, Duane responded: "No, not whatsoever. Since the house been fixed or since I left there, no, I

---

presumptively void and the burden of proof does not shift to Defendants to justify upholding those transactions.

Plaintiff did not contend that the Spendthrift Clause of the Trust Agreement limited his or the Trustees' ability to make gifts from the Trust. Accordingly, I do not address that issue.

[94]     Tr. 171, 196 (Duane).

haven't been there."[95] Duane further asserted that any witness who testified to the contrary would be lying.[96] In a similar vein, Duane denied that he ever authorized any gifts to anyone from the Trust other than to two individuals – namely, Mr. Sal and Harold Gregory. Duane swore that they were "the only two people that I ever gave money to, because they're my best friends."[97] That testimony, however, conflicts with the evidence provided by several other witnesses and with a number of trial exhibits. Thus, while I do accept some aspects of Duane's testimony, I find his testimony on the subject of gifts from the Trust to be unreliable.

More than one witness stated that shortly after Duane received his settlement money, he created or effectively dictated a list of family members and friends to whom he wanted to make modest gifts.[98] No such list was ever produced in the litigation or made an exhibit at trial. Nevertheless, several witnesses identified certain specific individuals who received gifts and the amounts they received. In addition, Joint Trial Exhibit ("JX") L consists of a number of cashier's checks that allegedly reflect gifts Defendants contend Duane authorized. There are copies of sixteen cashier's checks in Exhibit L. Two of the checks, dated November 9 and November 16, 2011, respectively,

---

[95] Tr. 203.

[96] *Id.* at 204.

[97] *Id.* at 209-10.

[98] Tr. 318-19 (Allen); Tr. 258 (Shalon).

are to Sal Panariello for $3,000 and to Harold Gregory for $1,000.[99] This evidence corresponds fairly closely to Duane's testimony regarding the gifts he authorized to Mr. Sal and Harold Gregory.[100] With only three exceptions, all of the cashier's checks in JX 11 bear dates in November 2011, the first full month the Trust was in effect. The exceptions are a check to Julius Allen Hardy for $700 dated January 23, 2012, one to Vernell Hardy for $500 dated January 19, 2012, and one to Shalon Hardy for $1,000 dated March 9, 2012. Shalon, who helped Duane on occasion, testified that she asked Duane for the $1,000 check to her.[101] Based on the relatively small amounts of the gifts to Julius and Vernell, and the fact that cashier's checks were used, I find that Duane did authorize those gifts, as well.

The elements of a claim for breach of fiduciary duty are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty.[102] In considering a party's claims, "the relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact."[103] To disprove Duane's testimony that he authorized only two gifts from the Trust, totaling $3,000,

---

[99] JX L at 12, 14.

[100] The only deviation is that Duane said he had given "Mr. Sal" $2,000, instead of $3,000 as reflected on the cashier's check.

[101] Tr. 272-73 (Shalon).

[102] *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd,* 806 A.2d 164 (Del. 2002).

[103] *In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008).

Defendants produced copies of cashier's checks they dispersed to a number of Duane's family and friends. Defendants also called several witnesses who testified that Duane promised them the money they received. Having considered all the evidence on the issue of these gifts, I find that Duane did ask Sherry and Michael to give monetary gifts to a select group of donees beyond the two persons Duane identified.

Considering Duane's history of reliance on others for money, housing, and other necessities throughout his life, I find incredible his testimony that he did not intend to make a relatively small monetary gift to a single member of his family after he received his settlement. Furthermore, Defendants presented convincing contrary evidence, including the fact that the Trustees used cashier's checks instead of cash for the alleged gifts. By using cashier's checks, Defendants created a more reliable and transparent record of what they had done. Because this supports Sherry and Michael's defense, I find that Duane has failed to sustain his burden of proving by a preponderance of the evidence that the disputed gifts were not authorized. Accordingly, I hold that Sherry and Michael did not breach any fiduciary duty in connection with the $30,200 in documented gifts to the indentified third parties. I deny, therefore, Duane's claim to that extent.

## C.    Unverifiable expenditures

### 1.    The duty to account

As fiduciaries, trustees have a duty to account to beneficiaries for their disposition of trust assets and bear the burden of proving that a disposition was proper.[104] "[I]ncluded within the duty to account is a duty to maintain records that will discharge the fiduciaries' burden, and that if that duty is not observed, every presumption will be made against the fiduciaries."[105]  The other items for which Duane asserts claims for breach of fiduciary duty and monetary relief generally relate to the failure of Sherry and Michael to account to Duane for the performance of the Trust and to the existence of numerous unverifiable expenditures.  I turn to those issues next.

### 2.    The $9,000 that was never deposited into the Trust account

While Duane's initial settlement disbursement was for $345,676.88, only $336,676.88 was deposited into the Trust bank accounts.  Each Trustee provided a different explanation for how the missing $9,000 was spent.  According to Sherry, Duane received about $3,000 and about $6,000 went to household bills.  When questioned further, she also said some of the money may have gone to family members.  Michael testified that all of the money went to Duane, who spent most of it on a trip to Atlantic City and gave the rest to family members.  Because Sherry and Michael produced no records to support their "accounting" for the disposition of the $9,000, every presumption

---

[104]    *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *3 (Del. Ch. May 31, 2000).

[105]    *Technicorp Int'l II, Inc.*, 2000 WL 713750, at *3.  *Id.*

31

must be made against them. Duane admitted that he took three separate trips to Atlantic City and received $2,000 in cash from the Trust for each trip.[106] One of those trips occurred immediately after he received the funds from the settlement. In addition, Duane testified that the cost of his hotel room in Atlantic City was paid for in advance, so that the $2,000 he received in cash was in addition to that.[107] Assuming the cost of the hotel room for a couple of nights was approximately $1,000, but otherwise making any presumptions in favor of Duane and against Defendants, I find that Sherry and Michael have failed to account for $6,000 of the $9,000 that was not deposited in the Trust accounts in October 2011. Therefore, Sherry and Michael breached their duty to account for that item to the extent of $6,000.

### 3.    The unaccounted for $121,688

Of the $336,676.88 Sherry and Michael did deposit into the Trust accounts, Plaintiff contends they withdrew approximately $319,100 of it in cash.[108] Defendants provided sufficient records or credible evidence to demonstrate how some, but not all, of that cash was spent, leaving $121,688 unaccounted for. As Trustees, Sherry and Michael bear the burden of proving that the disposition of the $121,688 was proper. In their testimony, which Duane controverted, Defendants averred that Duane frequently asked for large amounts of cash in order to support his drug addiction and pay off debts,

---

[106]    Tr. 190-91.

[107]    Tr. 215.

[108]    Pl.'s Post-Trial Opening Br. 44 n.20.

presumably drug or alcohol-related, and that Defendants feared that Duane might be harmed if they did not give him the money to repay the "loans." To resolve this factual dispute, I must address a threshold issue regarding the admissibility and reliability of a compilation of receipts Defendants produced at the end of the discovery period.

### 4. Is Defendants' compilation of receipts (JX Z) admissible?

Defendants Sherry and Michael principally rely on their compilation of receipts to rebut Duane's claims that they breached their duty to account as to more than $100,000 in allegedly undocumented and unverifiable Trust dispositions. Defendants maintain that the receipts show that most of the funds unaccounted for went directly to Duane in the form of cash. Duane vigorously disputes the authenticity of the receipts and seeks to have them excluded from evidence.

Several factors make the authenticity of the receipts highly suspect. Notably, neither Sherry nor Michael mentioned the receipts during their depositions when asked how they recorded transactions involving the Trust funds. The earliest receipt is dated November 2, 2011, and the latest April 24, 2012. Sherry was deposed on August 7, 2012. At that time, the bank records had been produced, but not the receipts. After Plaintiff's counsel inquired about the numerous checks made out to cash, the following exchange occurred:

> Q: Did you keep track of how [the money was spent]?
> A: Somewhere, I guess. I have to check. I will have to check.
> Q: Did you have a checkbook, a check regist[er]?
> A: I will have to check.
> Q: But you are not answering my question. Did you write it down? Did you type it into a computer?

33

A:    **I'm not sure.**

Q:    So you kept track of what all the money was for, but you are not sure how?

A:    Well, you can ask Michael that.

Q:    Well, I'm asking you.

A:    I didn't do the stuff here.

Q:    So you didn't keep track of where the money went?

A:    Sometimes I did, and sometimes I didn't.

…

Q:    So is what you are telling me, you don't know if you did or didn't keep track of where the money went?

A:    I probably did.

Q:    You probably did, and if you did, you wrote it down?

A:    Possibly.[109]

Sherry never mentioned the existence of the receipt book in her deposition. In fact, Defendants did not disclose the existence of the receipts until September 4, 2013–a deadline set by the Court after a later motion to compel.

Michael also was deposed on August 7, 2012. He, too, did not disclose the existence of a receipt book:

Q:    Do you have any sort of records of the trust expenditures?

A:    Possibly.

Q:    Okay. Where do you think that might be.

A:    I would have to look around.

Q:    Well, I will ask you another question. Did you make it a *habit* when an expenditure was made of writing down? You cashed all these checks. Did you write down where the money went?

A:    No. That's what bank records are for.

Q:    But the bank records just shows a check made out to cash.

A:    Right.[110]

---

[109]    JX K at 44-46 (emphasis added).

[110]    Tr. 242 (Michael) (emphasis added).

During the trial, however, Sherry and Michael both purported to describe in detail the procedure they followed when Duane asked for money. That procedure allegedly involved filling out the receipt book, having Duane sign the receipt every single time, Michael keeping the yellow copy, and Duane receiving the white.[111] If Defendants had a consistent procedure for giving Duane money, it is unlikely that either Sherry or Michael could have forgotten about the receipt book, especially considering how frequently they claimed Duane asked for money. Indeed, Michael asserted at trial that he did not forget about the receipts, but instead lied under oath during his deposition. Despite his evasive answers during his deposition, Michael insisted at trial that he always recorded any transactions in the receipt book, and simply "chose not to tell the truth" during the deposition.[112] Michael's directly contradictory testimony on this issue undermines his credibility generally and also raises serious questions about the authenticity of the receipts.

Additionally, the belated timing of the production of the receipts raises questions about whether the receipt book even existed before Defendants' depositions or, instead, was created later. Sherry and Michael failed to mention the receipt book in their depositions or in response to either of Plaintiff's two motions to compel Defendants'

---

[111] Tr. 236 (Michael). Duane denied signing or having any such receipts, and apparently did not have any of them in his possession. *See* Tr. 182 (Duane stating that the first time he saw the receipts was in his attorney's office).

[112] Tr. 244 (Michael).

35

production of "copies of all financial records maintained by trustees, but not limited to accounting books, spreadsheets, checking account balances, and other related documents indicating withdrawals and deposits from the Duane C. Hardy 2011 Trust."

Moreover, the receipts themselves contain multiple discrepancies that undermine their validity. As previously stated, the dates of the receipts do not appear in the logical order that one would expect if the receipts, in fact, were filled out each time Duane asked for money. Also, Duane's signature on the receipts is inconsistent and the receipts often do not match up to the bank statements. Further, the receipts indicate that Duane received from Defendants $154,708.20 in cash. Yet, the verified expenditures, including the Mercedes and the Lincoln, the renovations to the Hardy Residence, and Duane's rent and other expenses,[113] account for $214,988. If the receipts are accurate, then Defendants spent $369,696, when the Trust only contained $345,676.88. Inferences reasonably drawn from Defendants' contradictory testimony, the suspicious timeline of when Defendants produced the receipt book, and the multiple discrepancies within the receipts support the conclusion that Defendants created the receipt book after Duane initiated this litigation, in an effort to avoid or minimize his liability. Therefore, I find that the receipts

---

[113] The following are the documented transactions for the benefit of Duane: $8,516 for Duane's rent, $2,491 to furnish his apartment, $5,060.34 in MoneyGrams, $549.18 for groceries, approximately $9,500 for trips to Atlantic City.

do not constitute reliable evidence, and I will not consider them in the analysis of whether the Defendants breached their duty to account and to maintain records.[114]

Despite Defendants' lack of records, after listening to Duane's testimony and even drawing all reasonable inferences in his favor, I am convinced that at least some relatively modest portion of the unaccounted for Trust funds went to Duane or to pay "debts" he incurred to various individuals. Duane has struggled with drug and alcohol addiction, although he claims he has not been using illegal drugs for more than three years.[115] In fact, during the trial, he asserted that he was intoxicated on a few specific occasions to avoid responsibility for and circumvent the legal consequences of his actions. For example, Duane claimed that when he signed the Consent Document, he did not know what he was signing in part because he was "under the influence of alcohol."[116] In addition, I note that Duane created the Trust because he doubted his ability to manage his money responsibly and knew that he was susceptible to the influence of others. To a limited degree, therefore, I credit Defendants' poorly documented testimony that Duane involved himself with and indebted himself to questionable people. For similar reasons, I

---

[114] Essentially, Defendants failed to authenticate the compilation of receipts by failing to present probative evidence sufficient to support a finding that they are what Defendants claim. *See* D.R.E. (901)(a).

[115] Duane was released from prison in June 2011. Tr. 174 (Duane). He denies having used any illegal drugs since that time. Tr. 197.

[116] Tr. 187 (Duane).

do not consider trustworthy Duane's unqualified denial that he knew or owed money to *any* of the people Defendants or other witnesses mentioned in their testimony at trial.

While I believe that at least some of the unaccounted for money went to Duane or was spent for his benefit, in deciding how much, I must balance Duane's culpability with the duty of care and the duty to account Sherry and Michael owed Duane. As Trustees, Sherry and Michael are "under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property."[117] Sherry and Michael had a duty to exercise care and to account with regard to all of the Trust transactions they engaged in as Trustees, including transactions made at Duane's request. In establishing the Trust, Duane sought to rely on the Trustees' judgment, rather than his own, in order to protect his assets. Sherry and Michael insist that all of the inadequately documented $121,000 in expenditures went to Duane. Even if they had sufficient records to support that allegation, however, Defendants failed to present any persuasive evidence that would justify their having given Duane such a large percentage of his Trust in less than a year. While it might be prudent to give money to an individual who may otherwise be in danger, distributing a total of over $120,000 in cash within a six-month period in a series of numerous transactions to a person who suffers from mental illness and drug addiction is grossly inconsistent with "ordinary prudence." In considering the circumstances and the evidence, therefore, I find that Defendants

---

[117] *In re Cook's Trust Estate*, 171 A. 730, 731 (Del. Ch. 1934).

breached their duty of care and duty to account as to $90,000 of the $121,685.87 in unaccounted for Trust assets.

**D.      Are Sherry and Michael entitled to exculpation under the Trust Agreement for any of their breaches of fiduciary duty?**

Under the Trust Agreement's exculpation clause (Article 7B), there are limits to Sherry and Michael's liability. Article 7B provides in relevant part: "The Trustee shall not be liable for any act or omission in the administration of the trust or for the loss or damage to trust property, except as caused by the trustee's intentional misconduct or gross negligence."[118] Thus, to succeed in holding Sherry or Michael or both liable for monetary damages for breach of any fiduciary duty or loss of trust property, Duane must prove that they engaged in intentional misconduct or acted with gross negligence. I turn next, therefore, to a brief analysis of each of the instances in which Sherry and Michael breached one or more of their fiduciary duties to determine whether their acts or omissions in connection with that breach are exculpated.

Sherry and Michael breached their duty of loyalty to Duane and the Trust when they spent over $158,000, nearly half of Duane's settlement, on luxury vehicles for themselves and renovations to the Hardy Residence, where Duane no longer lived and in which he held only a small ownership interest. Those actions directly contravened the purpose and terms of the Trust and were not preceded or attended by any voluntary and fully informed consent by Duane, let alone a consent based on the impartial advice of a

---

[118]      JX A at 6.

39

competent and disinterested third person. I find, therefore, that as to these breaches of duty, Sherry and Michael engaged in intentional misconduct or, at a minimum, were grossly negligent in the performance of their duties as Trustees.[119] Thus, Sherry and Michael are liable for any damages resulting from the purchase of the automobiles or the improvements to the Hardy Residence not properly allocated to Duane.

As to the $6,000 of unaccounted for losses from the Trust principal that occurred immediately before the opening of the two accounts at WSFS in late October 2011, Plaintiff failed to prove that loss resulted from either intentional misconduct or gross negligence. Rather, it appears to have been the product of simple negligence and inadequate recordkeeping. I hold, therefore, that Sherry and Michael are not liable for the loss of that $6,000 based on Article 7B of the Trust Agreement.

Finally, I address Defendants' breach of duty in failing to account for the disposition of $90,000 of the Trust. In that regard, I note that Sherry and Michael withheld from Duane bank statements and related information regarding the Trust

---

[119] Gross negligence in the civil context is defined as a higher level of negligence representing an extreme departure from the ordinary standard of care. In other words, a finding of gross negligence requires more than ordinary inadvertence or inattention. The Delaware Supreme Court has referred to gross negligence as the functional equivalent of criminal negligence, which is defined as the failure to perceive a risk of harm of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of conduct a reasonable person would observe. The words willful and wanton imply a degree of negligence higher than gross negligence. In order for conduct to be willful or wanton, it must reflect a conscious indifference or an 'I don't care' attitude. *Brown v. United Water Del., Inc.*, 291, 2010 WL 2052373, at *276 (Del. Super. May 20, 2010) (internal quotations omitted).

accounts, transferred the remainder of the Trust to two new bank accounts after learning that Duane had gained access to account information regarding the original accounts, and instructed the law firm handling the remainder of Duane's settlement to withhold from Duane all information regarding the Trust. Based on Defendants' efforts deliberately to conceal information from Duane and their failure to keep adequate records of the expenditures they made, to whom, and for what purpose, I find that Sherry and Michael engaged in willful misconduct or were at least grossly negligent with respect to the $90,000 in unaccounted for funds. Therefore, I conclude that the exculpation clause does not insulate Defendants from liability for that loss.[120]

### E.   Removal of Trustees

Part of the relief Duane seeks in this action is the removal of Sherry and Michael as Trustees and the appointment of a professional trustee. The Court of Chancery has the power to remove a trustee, but does so sparingly.[121]   Removal of a trustee is reserved for situations in which the trust property is "endangered by a lack of capacity, honesty or fidelity," and is not appropriate for "some mere negligent breach of duty, arising largely from an honest mistake."[122]

---

[120]   If Defendants' decision to comply with Duane's requests was merely imprudent and violative of their of care duty, the exculpatory clause could conceivably protect Sherry and Michael from liability for ordinary negligence. JX A at 5. Their evidence shows, however, that Defendants' actions were significantly more culpable than that.

[121]   *In re Catell's Estate*, 38 A.2d 466, 469–70 (Del. Ch. 1944).

[122]   *Id.*

41

There is no better evidence to suggest that the Trust property is "endangered by a lack of capacity, honesty or fidelity," than the zero balance that remains in both of the Trust accounts. In fact, even Defendants acknowledge that they "should have first declined to serve and once they agreed to serve, they should have considered hiring a third party to assist them in the administration of the trust."[123] For the reasons stated in Section II.A *supra*, I have determined that, in several instances, Sherry and Michael's misadministration of the Trust not only breached their fiduciary duties, but also constituted gross negligence or intentional misconduct. Defendants spent nearly half of the Trust on self-interested transactions, while failing to leave Duane with enough money to pay his rent much beyond the end of this year, 2014. Further, I am convinced by Defendants' conduct, including their attempts to conceal account information from Duane, lying under oath, and fraudulently conveying the Mercedes in direct violation of the Court's orders, that if they remained as Trustees, their lack of honesty would endanger what little additional funds Duane has left from his settlement with the Diocese.[124] Therefore, I conclude that Defendants' actions since the creation of the Trust in October 2011 justify removing Sherry and Michael from their roles as Trustees.

---

[123]  Defs.' Post-Trial Br. 5.

[124]  The two smaller distributions Duane received from his settlement currently are being held in escrow by Jacobs & Crumplar.

By way of further relief, Duane seeks the appointment of Life Solutions, Inc., or its equivalent, as substitute trustee.[125]  The Court of Chancery possesses the authority to appoint a trustee if the trust instrument fails to do so.[126]  "Where the terms of the trust provide a method for filling vacancies by some method other than by appointment of the court, however, the designated method of replacement should be followed.[127]  Article 10 of the Trust Agreement deals with Successor Trustees.  It provides:

> At such time as SHERRY L. HARDY or MICHAEL T. HARDY is no longer willing to serve as co-Trustee hereunder, the other co-Trustee then serving shall continue as Trustee hereunder, serving as the sole Trustee.  If a trustee is serving as sole trustee, that trustee may appoint one or more persons or institutions to serve either (or both) as co-trustee or as successor trustee (in that order named by the sole trustee).
>
> Trustee may at any time appoint a qualified nonprofit organization, such as Delaware CarePlan, Inc., to serve as successor Trustee, and may amend this Trust Agreement, without the need for court approval, to conform the terms of this Agreement to those customarily used by such successor trustee.[128]

Having concluded that both Sherry and Michael intentionally or with gross negligence repeatedly violated their fiduciary duties to the Trust, I will order that they be removed as

---

[125]   Pl's Post-Trial Opening Br. 46; Joint Pre-Trial Stip. and Order § IV.A(3).

[126]   *McNeil v. McNeil*, 798 A.2d 503, 513 (Del. 2002).

[127]   *Id.* (citing Austin Wakeman Scott & William Franklin Fratcher, *Scott on Trusts*, § 388 (4th ed. 1987)).

[128]   JX A at 6-7.

43

Trustees. Consequently, neither Michael nor Sherry will be in a position to appoint a Successor Trustee.

Nothing in the terms of the Trust Agreement appears to provide an alternative method for filling vacancies other than by a Trustee's appointment of nonprofit organization or implicitly by appointment of the Court. The last paragraph of Article 10 of the Trust Agreement indicates that Duane, as Settlor of the Trust, was amenable to the appointment of a qualified non-profit organization to serve as Successor Trustee. To the extent possible, I will attempt to honor that expression of intent in appointing a Successor Trustee.

Nothing in the record indicates that the successor Trustee requested by Plaintiff in this litigation, Life Solutions, Inc. is a qualified non-profit organization[129] as specified in Article 10 of the Trust Agreement. Therefore, I provisionally will deny Duane's request to have Life Solutions, Inc. appointed as substitute trustee, and appoint, instead, Delaware CarePlan, Inc. to serve as successor trustee. If Delaware CarePlan is unwilling to serve, the Court directs Plaintiff's counsel to submit a list of other qualified non-profit organizations in Delaware that could fulfill that role, and to indicate any preference Duane has in that regard. If there is no other qualified non-profit organization, the Court will appoint Life Solutions, Inc. in accordance with the authority granted in 12 *Del. C.* §§ 3501 and 3502.

---

[129] I have no reason otherwise to question the competence of Life Solutions, Inc. to fill the role of Successor Trustee.

### F. Duane's attorneys' fees and costs

### a. The American Rule and its exceptions

Plaintiff requests that the Court hold Sherry and Michael liable for the entirety of Duane's attorneys' fees and expenses on two grounds: (1) their egregious pre-litigation conduct; and (2) their bad faith conduct during litigation. Under the American Rule, litigants are generally responsible for their own legal fees, regardless of which party prevails.[130] Delaware law provides, however, that "[i]n judicial proceedings involving breaches of trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorneys' fees, to any party, to be paid by another party or from the Trust that is the subject of the controversy."[131] In addition, an exception to the American Rule exists where the party against whom attorneys' fees are sought to be assessed acted in bad faith in bringing a case or in pursuing it in a way that increased the litigation's cost or in the conduct that gave rise to the litigation, such that attorneys' fees may be considered an appropriate part of damages.[132] The decision to award attorneys' fees is within the Court's discretion.[133]

---

[130] *Tandycrafts, Inc., v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989).

[131] 12 *Del. C.* § 3584.

[132] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 687, 2013 WL 1914714, at *12 (Del. 2013).

[133] *McNeil v. McNeil*, 798 A.2d 503, 514 (Del. 2002).

### b. Attorneys' fees for pre-litigation conduct

With respect to pre-litigation conduct, not "every case of intentional fiduciary wrongdoing justifies fee-shifting."[134]  Rather, the exception is normally applied only in instances of bad faith, "where the pre-litigation conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages."[135]

Duane created the Trust Agreement on August 31, 2011 and the settlement funds first were deposited in the Trust's accounts on October 28, 2011.  Duane filed his Complaint on May 15, 2012.  On October 27, 2011, the Trust principal was over $345,000.  By the end of March 2013, all that remained was $3,654.  Thus, on Defendants' watch as Trustees, approximately 99% of Duane's Trust was dissipated in five months with virtually no tangible benefit to Duane being evident.

Defendants' mishandling of the Trust demonstrates a glaring lack of financial acumen and an utter disregard for Duane's best interest.  The Trustees, who both were unemployed when they assumed their fiduciary positions, never had managed a large sum of money and had no money management training other than their "life experience."[136]  If their mismanagement of the Trust had stemmed predominantly from their lack of education and financial training, I probably would not be inclined to find bad faith. Sherry and Michael's actions, however, were more culpable than that.  Within two weeks

---

[134]   *Venhill Ltd. P'ship ex rel. Stallkamp v. Hellman*, 2008 WL 2270488, at *33 (Del. Ch. June 3, 2008).

[135]   *Estate of Carpenter v. Dinneen*, 2008 WL 2950764 (Del. Ch. Mar. 6, 2008).

[136]   JX P at 24.

46

of obtaining the settlement funds, they each bought themselves luxury automobiles at Duane's expense without informing him in advance of what they were doing or making any reasonable effort to ensure that he understood the situation and its ramifications and gave his fully informed consent to those transactions. Sherry and Michael also engaged in similarly self-interested transactions regarding the improvements to the Hardy Residence. In addition, Defendants not only breached their duty to account for the performance of the Trust, Sherry and Michael actively restricted Duane's access to account information and tried to conceal that information from him by opening new accounts without telling Duane about them. Based on the evidence adduced at trial, I find that Sherry and Michael acted egregiously and with utter disregard for the purpose of the Trust–*i.e.*, "to insure that, to the best extent possible the physical necessities, comfort, happiness and best interests of [Duane] will be met." I conclude, therefore, that Sherry and Michael's pre-litigation conduct amounted to bad faith and will require them to pay Duane's reasonable attorneys' fees and expenses in connection with the prosecution of this action as part of his resulting damages.

### c. Attorneys' fees for bad faith litigation

Plaintiff also seeks attorneys' fees on the grounds Sherry and Michael conducted this litigation in bad faith. In extraordinary circumstances, Delaware courts have relied on the bad faith exception to the American Rule and awarded attorneys' fees where "parties have unnecessarily prolonged or delayed litigation, falsified records or

47

knowingly asserted frivolous claims."[137]  To satisfy the bad faith requirement, a party's conduct "must rise to a high level of egregiousness, such that their actions extend beyond the realm of zealous advocacy."[138]  The Court does not lightly apply this exception and imposes a "stringent evidentiary burden of producing clear evidence of bad faith conduct on the party seeking an award of fees." [139]  The Delaware Supreme Court, in *Johnston v. Arbitrium (Cayman Islands) Handels AG*,[140] upheld this Court's award of attorneys' fees when the litigants unnecessarily required the institution of litigation, delayed litigation, falsified evidence, asserted frivolous motions, and provided inconsistent testimony to suit their needs.[141]

Plaintiff contends that Defendants' refusal to respond to discovery requests, late production of relevant documents, fraudulent transfers of the Lincoln and Mercedes in contravention of the Court's order, and Michael's false statements under oath, among other things, warrant fee shifting in this case.  Defendants' disregard for the Court's explicit orders as to the automobiles unnecessarily increased Duane's litigation expenses.  In addition, Michael admittedly lied during his deposition when asked about the existence of accounting records for the admitted purpose of misleading opposing counsel.  I find,

---

[137]  *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998).

[138]  *Estate of Carpenter,* 2008 WL 2950764, at *17.

[139]  *Id.*

[140]  720 A.2d 542 (Del. 1998).

[141]  *Id.* at 564.

therefore, that Plaintiff has shown that Defendants acted in bad faith during the course of this litigation and award Duane his attorneys' fees on the basis of that misconduct and Defendants' various breaches of their fiduciary duties as Trustees. Thus, Defendants are liable for the reasonable attorneys' fees and expenses Duane incurred in connection with this action.

### G. Plaintiff's motions to set aside Michael's transfer of the Mercedes as fraudulent and for contempt

#### a. Background facts

On April 22, 2014, over six months after the trial, Duane moved to set aside an alleged fraudulent transfer of the Mercedes from Michael to a woman who shared the same address with him in Pennsylvania. The motion also sought to hold Michael in contempt for the transfer. Despite the passage of more than three months since the filing of that motion, neither Michael nor Sherry has responded to it. Accordingly, I consider the motion ripe for decision at this time.

On May 15, 2012, Plaintiff filed his Complaint against Sherry and Michael alleging intentional misconduct, gross negligence, and unjust enrichment in their capacity as Trustees of the Trust.[142] The Complaint specifically focused, among other things, on Michael's purchase of the Mercedes with funds from the Trust. Duane alleged, and this Court has found, that Michael purchased the Mercedes with funds from the Trust. A title search conducted by Plaintiff's counsel indicated that Michael received title to the

---

[142]    Compl. ¶ 5.

Mercedes in Delaware on November 6, 2011.[143] The search listed the Hardy Residence as Michael's address.[144] At the trial of this matter on October 15, 2013, Plaintiff's counsel requested an order from the court that none of the Trust assets that were left be sold or encumbered, pending the Court's decision on the merits.[145] The Court granted that request, stating that no "assets from the trust should be transferred, conveyed, spent [or] paid to anybody until [this] matter is resolved" (the "October Order").[146] Michael was present when the Court issued that directive, and had testified earlier that same day.[147] Therefore, Michael knew the Mercedes was not to be transferred or conveyed.

The day after the October Order was entered, Duane's counsel requested a vehicle record abstract for the Mercedes. The record, dated October 16, 2013, indicated the Mercedes still was registered to Michael, but not at the Hardy Residence. Instead, Michael's address was listed as 209 S. 4th Street, Apt. 2, Darby, Pennsylvania.[148] An updated vehicle record obtained on April 4, 2014 indicated that title to the Mercedes then

---

[143] Pl.'s Mot. to Set Aside Michael T. Hardy's Fraudulent Transfer and Mot. for Contempt Ex. A (D.I. No. 102) (hereinafter "Pl.'s Mot. for Fraudulent Transfer and Mot. for Contempt).

[144] *Id.*

[145] Tr. 346.

[146] Tr. 347.

[147] Tr. 235-53.

[148] Pl.'s Mot. for Fraudulent Transfer and Mot. for Contempt Ex. B (D.I. No. 102).

was held by Kristina Monique Moses,[149] residing at the same address that had been listed for Michael on the October 16 record.[150] There is no evidence that any consideration was paid for this transfer of title.

In Duane's motions, he argues that Michael violated the October Order by transferring title to the Mercedes to Moses. Duane also asserts that the conveyance of the Mercedes to Moses was fraudulent under the Delaware Uniform Fraudulent Transfer Act.[151]

### b.        Was the transfer to Moses fraudulent?

Section 1304(a)(1) declares as fraudulent:

> "a transfer made or obligation incurred by a debtor as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor."[152]

To prove Michael's transfer of the Mercedes to Moses was fraudulent under Section 1304(a)(1), therefore, Duane must show Michael actually intended to hinder, delay or defraud him. Section 1304(b) lists eleven numbered factors that may be considered in determining actual intent.

---

[149]    *Id.* Ex. C.

[150]    *Id.* Ex. B.

[151]    Pl.'s Mot. for Fraudulent Transfer and Mot. for Contempt ¶ 24.

[152]    6 *Del. C.* § 1301(a)(1).

51

With relevance to this case, the following factors support a finding of actual intent "to hinder, delay or defraud": (1) if the transfer or obligation was disclosed or concealed;[153] and (2) if before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.[154] Both of these factors listed in Section 1304(b) support a finding that Michael had an actual intent to defraud here.[155] First, the transfer was concealed from both Duane and the Court. The Mercedes was first registered in Delaware, then changed to Pennsylvania, and finally transferred to Moses. No disclosure about the transfer was made to Plaintiff or to the Court even though Michael was on notice that he could not sell or transfer the Mercedes without providing advance notice to the Court until resolution of this case.[156] Second, before the transfer was made, Michael not only had been sued by Duane regarding the Trust, but Duane's

---

[153]    6 *Del. C.* § 1301(b)(3).

[154]    6 *Del. C.* § 1301(b)(4).

[155]    Several other factors under 6 *Del. C.* § 1301(b) also support the conclusion that Michael had an actual intent to hinder delay or defraud. For example, factor b(1) focuses on whether the transfer was made to an insider. The Act defines an "insider" of a debtor who is an individual to include "[a] relative of the debtor." 6 *Del. C.* § 1301(a)(1). Moses shares the same address as Michael. Therefore, she conceivably could be an insider under the Act. Additionally, factors b(2) and b(7) similarly support this conclusion.

[156]    On January 16, 2013, during oral argument on Plaintiff's Motion to Set Aside Tolmiros, LLC's Fraudulent Transfer to Sherry L. Hardy, the Court notified Michael that he was not to transfer or sell the Mercedes without disclosing his intentions to the Court. Specifically, the Court ordered: "If you are planning to sell the Mercedes or some sort of thing like that you are going to have to let the [Plaintiff] and [the Court] know." Scheduling Conference and Pl.'s Mot. for Default Judgment as to Def. Tolmiros, LLC and the Court's Ruling at 9-10 (D.I. No. 103).

claims had been tried and Michael was awaiting a possible judgment against him.[157]
Hence, I find that Michael's transfer of the Mercedes to Moses was made with actual intent to hinder, delay or defraud Duane, and thus constitutes a fraudulent transfer.[158]

### c. Did Michael act in contempt of the October Order?

Court of Chancery Rule 70(b) authorizes the Court to provide relief "[f]or failure to obey a restraining or injunctive order, or to obey or to perform any order," upon defendant's knowledge of the order and facts constituting disobedience. In this case, the Court orally granted Plaintiff's request for, in effect, a status quo order at trial.[159] Specifically, the Court stated that "no assets from the trust should be transferred . . . to anybody until [this] matter is resolved."[160] Michael knew from the pretrial proceedings and the trial proceedings that same day that the Mercedes was alleged to be an "asset from the trust."

Because Michael was present when the Court gave the October Order, he was aware of the Order when he transferred the Mercedes to Moses, apparently for no consideration. Indeed, Michael was on notice since January 16, 2013, that the Mercedes could not be sold or transferred without disclosing his intentions to the Court in

---

[157] *Hardy v. Hardy*, No. 7531-ML (*filed* May 15, 2012).

[158] 6 *Del. C.* § 1304(a)(1).

[159] Tr. 347.

[160] *Id*.

advance.[161] The Mercedes was purchased with money from Duane's Trust and, therefore, was subject to the October Order. The vehicle record abstracts from the Pennsylvania Department of Transportation demonstrate that Michael transferred title to the Mercedes to Moses sometime after the October Order and before April 4, 2014. Based on these facts, I find that Michael acted in contempt of the Court when he transferred the Mercedes to Moses.

### d. Relief for the fraudulent transfer and contempt

The relief Plaintiff seeks for the fraudulent conveyance and contempt largely overlaps, so I discuss those issues together. First, Duane seeks to have Michael's registration of the Mercedes in Pennsylvania for the apparent purpose of divesting this Court of jurisdiction over it and his later conveyance of title in the vehicle to Moses set aside as fraudulent transfers. I will grant this relief. As of February 15, 2013, the Mercedes was registered to Michael in Delaware. In a telephone conference with the parties and counsel on January 16, 2013, I directed that no changes be made with respect to the Mercedes without prior notice to Plaintiff and the Court. On October 15, 2013, I ordered that no assets from the Trust, which would include the Mercedes, be transferred or conveyed pending the resolution of this matter. As of October 16, 2013, the Mercedes was registered to Michael in Pennsylvania, and then by April 10, 2014 it was registered in Pennsylvania to Moses. Under Section 1307(a) of the Uniform Fraudulent Transfer Act, a creditor, such as Duane, may obtain "[a]voidance of the transfer or obligation to

---

161    *See supra*, note 156.

the extent necessary to satisfy the creditor's claim." That relief is appropriate here. Therefore, I will set aside the transfer from Michael to Moses of the Mercedes and order Michael to have the Mercedes promptly reregistered in Delaware.

Plaintiff also seeks an order directing Michael to transfer title and the keys to the Mercedes to Plaintiff's counsel, as Plaintiff's representative, within five days of the Court's order, and that a constructive trust be placed on the vehicle. Consistent with the broad remedies for a fraudulent transfer authorized by Section 1307, I will grant that relief in the sense that I will impose a constructive trust on the Mercedes and direct that it be held by Plaintiff's counsel pending further order of the Court.

Finally, based on the Court's finding that Michael acted in contempt of the October Order, I grant Plaintiff's request for an award of its attorneys' fees and expenses in prosecuting the motions to set aside the transfer and for contempt. Thus, I will order Michael to pay those fees and expenses.

## III. CONCLUSION

For the reasons stated in this Memorandum Opinion, I conclude as follows:

(1)     that Sherry and Michael breached their fiduciary duty of loyalty to the Trust and Duane, as the Beneficiary, in connection with the purchase of the Lincoln and the Mercedes and as to the Trust funds spent on repairs to the Hardy Residence, and are liable to Duane for $158,402.81 in damages as a result of those breaches;

(2)     that Duane failed to prove his claim for breach of fiduciary duty as to the $30,200 in gifts that were made from Trust funds to identified family and friends of Duane, and that aspect of his claim will be dismissed with prejudice;

55

(3) that as to the $9,000 from the settlement with the Diocese that was not deposited into the Trust's two accounts at WSFS in October 2011, Sherry and Michael breached their duty to account for $6,000 of that amount, but are exculpated from liability for that breach under the Trust Agreement; therefore, this aspect of Plaintiff's claim will be dismissed with prejudice;

(4) As to the $121,685.87 of the Trust funds that Plaintiff claims were not accounted for, Sherry and Michael breached their duty of care and to account as to $90,000 of that amount; I deny Plaintiff's claim for breach of fiduciary duty for anything above that $90,000 and will dismiss with prejudice that aspect of Plaintiff's claim;

(5) that the breach by Sherry and Michael referenced in subparagraph 4 above is not exculpated; so they are liable to Plaintiff for $90,000 on that aspect of his claim;

(6) that Sherry and Michael promptly shall be removed as Trustee of the Trust;

(7) that the Court will appoint Delaware CarePlan, Inc. ("DCP") as successor trustee, subject to DCP's agreement to serve in that role and obtaining any necessary modifications to the Trust Agreement; if complications arise in that regard, the Court will proceed as stated in Section II. E of this Memorandum Opinion;

(8) that Plaintiff is entitled to reimbursement from Sherry and Michael for the attorneys' fees and expenses Duane reasonably incurred in pursuing this action;

(9) that Duane is entitled to pre-judgment interest at the legal rate of interest under 6 *Del. C.* § 2301(a), compounded quarterly, on the following amounts of damages owed, jointly and severally, by Sherry and Michael from the dates indicated:

56

(a)     for the Lincoln and Mercedes, $83,402.81 from November 30, 2011;

(b)     for improvements to the Hardy Residence, $75,000, from November 30, 2011 from December 31, 2011, by which time it appears most, if not all, of the $75,000 had been spent;

(c)     for $90,000 in unaccounted for Trust funds from December 31, 2011.

(10)     that Plaintiff is entitled to the imposition of a constructive trust for Duane's benefit on: (a) the 8.3% interest Defendant Sherry holds in the Hardy Residence; and (b) the Lincoln and the Mercedes.[162]

For the reasons stated in this Memorandum Opinion, I also grant Plaintiff's Motion to Set Aside Fraudulent Transfer and Motion for Contempt, both of which relate to the Mercedes. On that basis, I will set aside the transfer of the Mercedes from Michael to Moses and order Michael promptly to have the registration of the Mercedes changed from Pennsylvania back to Delaware. I also will order Michael to transfer title and the keys to the Mercedes to Plaintiff's counsel, as Plaintiff's representative, within ten days of the Order that is being entered on this same date based on the rulings in this

---

[162]     Plaintiff also requests the Court to impose a constructive trust on items purchased to renovate the hardy Residence. Pl.'s Post-Trial Opening Br. 44. A constructive trust is an equitable remedy as to which one factor a court generally considers is the balance of equities. *See Real Estate of Shockley v. Foraker*, 2004 WL 51260, at *4 (Del. Ch. Jan. 6, 2004) (internal citations omitted). I deny without prejudice, this aspect of Plaintiff's request for relief, because I consider such relief to be premature and potentially overly disruptive and unnecessary at this point. The relief could involve for example, attempts to remove appliances and fixtures such as granite countertops from the Hardy Residence.

57

Memorandum Opinion, and will place a constructive trust on the Mercedes for Duane's benefit. In addition, based on my findings that Michael engaged in a fraudulent transfer and acted in contempt of this Court's October 15, 2013 Order, I grant Plaintiff's request for an award against Michael of his reasonable attorneys' fees and expenses incurred in prosecuting the Motion to Set Aside the Fraudulent Transfer and the Motion for Contempt.

Plaintiff's counsel shall file with the Court and promptly serve on Defendants within twenty days of the Order accompanying this Memorandum Opinion appropriate documentation for the reasonable attorneys' fees and expenses Plaintiff seeks to recover in connection with the prosecution of this action and the recent motions. Defendants shall have twenty days from the filing of that submission to object to the claimed attorneys' fees and expenses on any appropriate grounds, including that specific fees and expenses claimed are unreasonable in the circumstances. Thereafter, the Court will determine the appropriate amount of attorneys' fees and expenses to be awarded on the basis of the rulings set forth in this Memorandum Opinion.