71 A.2d 264 (1950)
SWAIN
v.
MOORE et ux.
Court of Chancery of Delaware, New Castle.
February 7, 1950.
Joseph Donald Craven, Wilmington, for plaintiff.
*265 H. Eugene Savery, Wilmington, for defendants.
SEITZ, Vice-Chancellor.
This is an action by a transferor seeking to recover money and property which he transferred to the defendants.
A chronological narration of the facts as I find them commencing in 1947 will best serve to point up the problem. At that time plaintiff was about 73 years of age. His wife died in the latter part of 1947, and while he had several children and grandchildren, as well as a brother and sister, he chose to live alone in his home in St. Georges. In January of 1948 he was seriously ill. After leaving the hospital, he lived with his brother and later with a daughter. It was not until March of 1948 that he was able to return to his own home. Although the plaintiff was weak from the effects of his illness, he prepared his own meals and took care of himself. He kept a garden and did a little work but was idle for the most part. While he was friendly with his neighbors, he had few visitors.
The lives of the plaintiff and the defendants did not cross to any substantial degree until April or June of 1948. The parties are in disagreement as to the time, but it is unimportant to the decision. The latest popular American vehicle of amusement  television  caused the activities of the parties to run into a common channel and ultimately into this court for scrutiny. Apparently in keeping with common experience, plaintiff's popularity and number of visitors increased substantially after he obtained his television set. Among those who came were the defendants Mr. and Mrs. Moore. They were a young couple with a small daughter. The defendants, being neighbors, were rather frequent visitors in the plaintiff's home, and it is fair to state that the plaintiff developed a feeling of real affection for the defendant Mrs. Moore.[1] By this I do not mean to suggest that either party was guilty of anything improper.
In May of 1948 the defendants had begun building a home on the highway not too far from the place where they then lived at St. Georges. The defendants had very little money and they alone did much of the work on their home. This work was done on week-ends and in the evenings. However, the defendants often stopped to see plaintiff's television after they finished work and plaintiff, being at loose ends, so to speak, came to follow their doings with real interest. The growth of this relationship is easy to understand, since plaintiff could pay his way and defendants were in the course of "getting things done".
In September 1948 plaintiff paid $175.50 for 26 loads of dirt fill for the property on which defendants were constructing their new home. Defendants say plaintiff insisted on buying the dirt. Plaintiff says defendant stated to him that her husband was home crying because the water was running into the cellar. He stated that he purchased the dirt to help the young people.
In October 1948 plaintiff gave the defendants $1,000.00 in cash to buy bathroom fixtures for the house. Defendant did not request the money, but suggested the need and defendants' lack of money.
At about the same time the plaintiff gave the defendants two $500.00 savings bonds which were made in the plaintiff's name, but payable on death to the defendants' young child. Parenthetically, the defendants since the hearing have voluntarily returned these bonds to the plaintiff. Their possession is, therefore, no longer in issue. The fact of this further example of his "generosity" cannot be ignored. Moreover, he bought several small items for the 7 year-old daughter.
On October 30, 1948, plaintiff was seriously injured in an automobile accident. He was supposed to dress up for Halloween, but was injured before he arrived at defendants' home. While in the hospital he was often visited by the defendant who on occasion embraced and kissed him and helped to nurse him. Defendant denies *266 she so acted but I am inclined to accept plaintiff's testimony. During plaintiff's hospitalization, defendant asked the plaintiff's brother whether he thought it would be all right for her to take a magistrate to the hospital so that she could have the papers concerning the car executed  the plaintiff having indicated previously that he desired her to have the car. Although the defendant denies this, I am inclined to believe it took place, particularly in view of what subsequently happened.
Shortly after the plaintiff was discharged from the hospital plaintiff and defendant, accompanied by plaintiff's brother, went to a magistrate's office in Middletown where the plaintiff apparently intended to make a codicil to his will.[2] Plaintiff testified that as the squire started to write out the codicil the defendant said "`Why don't you give me the car?' * * * `Any time you want to go anywhere at any time, I will take you.'" Defendant contends that plaintiff voluntarily made the assignment. She says the codicil was with respect to other property. A paper purportedly being a codicil was introduced in evidence which did not refer to the car. However, it is a fact that while there the plaintiff actually transferred title to the car to defendant and her husband. It appears that the defendants subsequently gave plaintiff their 1937 Ford. Plaintiff paid approximately $2,500.00 for his Hudson car.
In December of 1948 while plaintiff and defendant were in Wilmington plaintiff purchased a coat for her costing about $57.00. She was present at the time. Defendant testified that she had already ordered a new coat and it was only at plaintiff's insistence that she let him make the purchase. She did, however, call plaintiff's attention to her need for a new coat.
During January of 1949 plaintiff gave the defendants $2,700.00 in cash which they used in part to build a second floor on their new home. It was apparently orally agreed that plaintiff was to come to live with the defendants in consideration of the receipt of this sum of money. Mr. Moore said plaintiff was to live with defendants until his death unless he became bedfast. Plaintiff testified that defendant originally suggested that he come home with them. Defendants testified that plaintiff persisted until they consented to his request that they use the money to build the second story on their home. Defendants further testified that they had not intended to finish the second floor, and only did so because of plaintiff's repeated requests.
After this last transfer of money, the plaintiff had only $800.00 in cash and his home in St. Georges. He testified that he was saving the $800.00 for burial expenses.
The plaintiff went to live with the defendants in March of 1949 and left, disgruntled, in July 1949. The testimony is in discord as to why the plaintiff left. The plaintiff undoubtedly was dissatisfied with his treatment by the defendants and demanded the return of the money and car which he had transferred to the defendants. They refused and this lawsuit followed.
Plaintiff relies on 4 principles of law in support of his contention that he is entitled to have the money and property returned to him. They are:
1. The existence of a fiduciary relationship between plaintiff and defendants.
2. The existence of a confidential relationship and the absence of required independent advice.
3. Gifts are voidable as being against public policy where the size of the gift indicates improvidence.
4. Gifts made by an enfeebled person in consideration of the donee furnishing board and lodgings for life are voidable in the absence of a written agreement reciting the consideration for the "gifts".
Before discussing these principles, it is desirable to set forth a judicial evaluation of the situation in the light of all the testimony. Plaintiff, while physically weak, did not impress me as being senile or otherwise *267 mentally enfeebled. It is clear to me that he was a lonesome old man living alone who took a "shine" to a young couple who were willing to take the time to be kind to him. He became particularly fond of the defendant, in fact he stated that he "loved" her. The defendant was about 32 years old and not unattractive viewed through eyes of any age. In a period of about five months the plaintiff handed over to the defendants money and property worth approximately $6,500.00, plus the two bonds which are no longer in dispute, as well as numerous smaller items; all this from a man who had known the defendants for only a few months. The defendant stated that she thought it was strange that he was transferring these things to her family, but testified that they took them upon his insistence, apparently because he told them his own children had not done anything for him and consequently he felt no concern about them.
The defendants admitted that the plaintiff apparently felt closer to them than to his own kin, but they deny the existence of any fiduciary relationship or undue influence. They also point out that plaintiff had $800.00 left, plus a house worth about $6,000.00.
Is plaintiff, who admittedly made these transfers, entitled to relief in view of the situation presented?
I conclude that the evidence does not support any finding of actual undue influence on the part of the defendants. Nor do I believe there was any actual fraud.
Was there a fiduciary relationship existing between the parties with a consequent legal presumption of fraud?
The courts have consciously refused to delineate those situations where a fiduciary relationship may exist. It has done so because in the ramifications of human activity, it is undesirable to fix a rigid limitation on the application of such a salutary principle. See 3 Pomeroy's Equity Jurisprudence (Fifth Edition) § 956a.
I believe the circumstances here warrant the conclusion that a fiduciary relationship existed between the plaintiff and the defendants. My conclusion is based on factors I shall now mention. At the time these relatively substantial gifts were made the plaintiff was a lonely old man living alone. He was extremely fond of the defendant and her daughter, and for some reason, real or imaginary, soured on his own family. The defendant returned plaintiff's kindness and by the use of the power of suggestion caused plaintiff to turn over to her (a non-relative) or for the benefit of her family, money and property in amounts which indicated a substantial disregard of his own interest. Practically speaking, he turned over everything to them except his house and furniture. He testified that he discussed most everything with defendant. After his accident, he became even more dependent upon defendant. The circumstances of her driving him on errands and his accompanying her "for something to do" only point up the relatively superior position which defendant possessed in her relationship with the plaintiff.
Where, as here, a fiduciary relationship exists, the law will presume fraud and the burden of showing fairness in connection with the transfer of property is on the person seeking to sustain the transaction. See Peyton v. William C. Peyton Corp., 23 Del.Ch. 321, 7 A.2d 737, 123 A.L.R. 1482; Atkins v. Foreaker, 12 Del.Ch. 335, 338, 114 A. 173. This burden is even greater in the case of a transfer made without consideration. See 3 Pomeroy's Equity Jurisprudence (Fifth Edition) § 957 at page 800. Did defendants' evidence overcome this presumption?
Defendants' defense is that plaintiff wanted to do what he did and he knew what he was doing. However, the testimony exudes an aroma of exploited affection. Defendants knew of plaintiff's apparent coolness toward his own family and his affection for them and their child. They were well aware of the strangeness of his unnatural largess and yet kept on taking his money and property until he evidenced a reluctance to make further advances.
While I do not intend to imply that defendant's actions were part of a calculated *268 plan, nevertheless, I do think that legally the defendants should not be permitted to retain property which was obtained under the circumstances narrated. The relative position of parties may be such that a donor must be saved from himself, if not by the intended donee's refusal, then by court action. The defense that the donor consciously made the gifts will not normally prevent a court of equity from undoing acts of such extreme generosity in a situation such as is here presented. Exploitation of undue sympathy and affection is not to be approved merely because a donor is at the time conscious of his donative acts. I conclude that the defendants failed to discharge the burden imposed upon them. Compare Stewart v. Rundle, 1940, 2 Dom.Law Rep. 503.
In view of my conclusion it becomes unnecessary to decide whether the evidence of independent advice was here important. Compare Peyton v. William C. Peyton Corp., supra; Atkins v. Foreaker, supra. The same applies to plaintiff's other contentions.
Let us examine the particular transfers made by plaintiff to defendants and see what relief should be accorded him.
Two items under attack are the $175.50 which plaintiff paid for dirt and the $57.00 paid for the coat. Since I do not believe the defendants took plaintiff's property as a part of any calculated plan, it seems to me that plaintiff should not be permitted to recover the money for the dirt and the coat. In view of plaintiff's fair mental condition at the time he made this payment and in light of the fact that if they had been the only transactions they would not have been subject to successful attack, I feel that plaintiff is not entitled to repayment of this money. De minimis is also applicable.
In October 1948 plaintiff gave the defendants $1,000.00 in cash to buy bathroom fixtures. In view of the fiduciary relationship existing and the failure of defendants to show complete good faith in the matter, I conclude that plaintiff is entitled to the return of this item.
I further conclude that plaintiff is entitled to have returned to him title to the 1947 or 1948 Hudson car which he transferred to defendants. It was suggested that the transfer was made in consideration of defendants' chauffeuring plaintiff. However, I think this much too flimsy a basis for sustaining the transfer. Moreover, defendants transferred their old car to plaintiff presumably so he could drive himself. The Hudson car will, then, be returned to plaintiff and plaintiff in turn will re-transfer title to the Ford to the defendants.
We come finally to the $2,700.00 in cash which plaintiff gave defendants and which was used in part to build a second floor on the defendants' home. What is the situation with respect to this item in view of the oral agreement that it was given to defendants in consideration of their permitting plaintiff to live with them for the rest of his life, so long as he did not become bedfast? Plaintiff actually lived with defendants but a few months, and I deem it unnecessary to decide which party was responsible for his leaving, although it is to be noted that defendants were perfectly willing to have him leave. Under all the circumstances, and especially in view of the oral nature of the agreement with its lack of any guarantee against defendants disposing of the property, I feel that the agreement should be held to be ineffective. Plaintiff is, therefore, entitled to have returned to him the sum of $2,700.00 less a reasonable deduction for the time he actually spent with defendants. If counsel cannot agree on the amount of the deduction, I shall fix it in the judgment to be entered hereon.
Plaintiff is, therefore, entitled to recover his Hudson car and $3,700.00 less the indicated deduction. If defendants are unable to pay the money part of this decree within a reasonable period of time, an appropriate lien can be imposed on their real property.
An order accordingly will be entered on notice.
NOTES
[1] By "defendant" I refer to Mrs. Moore unless otherwise indicated.
[2] It does not appear that the magistrate was a member of the bar. The practice of laymen drawing wills for others is illegal. It is also to be deplored because of its often unfortunate consequences.