# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ESTATE OF GEORGE M. REED, JR., by and through George M. Reed, III as executor of the Estate,<br><br>and GEORGE M. REED III, as trustee of the GEORGE M. REED JR. TRUST U/A DTD 04/16/12,<br><br>and<br><br>GEORGE M. REED, III and DAVID S. REED, SR., as beneficiaries of the GEORGE M. REED, JR. TRUST,<br><br>        Petitioners,<br>v.<br><br>LISA GRANDELLI,<br><br>        Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 8283-VCG<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Date Submitted: January 23, 2015
Date Decided: April 17, 2015

David J. Weidman, of SERGOVIC, CARMEAN & WEIDMAN, P.A., Georgetown, Delaware, *Attorney for Petitioners*.

Dean A. Campbell, of LAW OFFICE OF DEAN A. CAMPBELL, LLC, Georgetown, Delaware, *Attorney for Respondent*.

**GLASSCOCK, Vice Chancellor**

1

Since the time of King David and Abishag—and, surely, before—certain old men have pursued an interest in certain young women.[1] Sometimes, as in that case, the relationship is one of a powerful man and an exploited woman. Sometimes, it represents, no doubt, a May-December mutual romance, or at least a mercenary exchange of value for value. In other cases, however, it involves exploitation of an elderly and vulnerable benefactor. This case involves a relationship that quickly arose between a moderately well-to-do recent widower in his mid-eighties and a diner waitress of an age to be his granddaughter. The Petitioners—the old man's heirs, trust and estate—allege the relationship is of the third variety described above; the Respondent contends it belongs in the second category.

During a fourteen-month relationship, George Reed, Jr. ("George Jr.")[2] lavished gifts on the Respondent, Lisa Grandelli, ranging from a few hundred dollars to a pickup truck costing over $30,000. He also paid cash—nearly a quarter-million dollars—for a condominium in Rehoboth Beach, titled jointly with Lisa with right of survivorship. The Petitioners, George Jr.'s estate, his trust and the beneficiaries of his will, seek, principally through imposition of equitable remedies, to recoup the value of these gifts.

---

[1] Of course, other May-December relationships involving other genders exist as well.
[2] I refer to members of the Reed family and to Lisa Grandelli by first names throughout this Memorandum Opinion for the sake of clarity; no disrespect is intended.

Individuals are presumed competent unless proven otherwise, and are free to deploy their assets, wisely or foolishly, as they see fit. Equity may act in appropriate cases to remedy breaches of fiduciary duty or oppression, or to carry out the true intent of parties. If, however, equity were empowered to remedy every improvident expenditure in aid of unrequited love or misplaced desire, Delaware would need a Chancery Courthouse on every corner.

## I. FACTS AND STAGE OF THE PROCEEDINGS

As of the beginning of 2011, George Jr. was an elderly man with various medical problems but still able to make financial decisions and drive and live alone, with basic assistance. His physician testified that he was able to make his own personal decisions up until the time of a second stroke in April 2012—that is, at all times pertinent—and testimony suggests that George Jr. was a strong-willed individual throughout his life.

After his wife of over 50 years passed away in January 2011, George Jr. was, understandably, saddened, but there is no evidence that he became clinically depressed. He kept up with social interactions with his friends and family, including weekly attendance at a veterans' social organization, kept in regular contact with his sons, and had lunch daily at his former business, the family-operated Dairy Queen in Camden. During his working life, George Jr. was a

3

successful businessman, and there is no indication that he remained other than assertive and strong-willed.

At some time in January or February of 2011, George Jr. had lunch with his son Scott at Hall's Restaurant ("Hall's") in Wyoming,[3] where he first met Lisa, who was his waitress. He took a shine to her and called her "Brown Eyes." George Jr. made frequent return visits to Hall's and asked for Lisa as his waitress.

Over the next several months, George Jr. would visit Hall's to see Lisa frequently, often asking her to come over to his home. She first obliged around June 2011, and began to see George Jr. outside of Hall's after that. Their relationship became physical, and George Jr. considered Lisa his girlfriend. He began to make cash gifts to her, and to loan her money. When her car was "condemned" as a result of a factory recall, George Jr. bought her a new truck for over $30,000.

At some point in the late summer or early fall of 2011, George Jr. asked Lisa to move in with him. She refused. When he asked to move in with her, she also refused. But the two began to look at property they could purchase together, first around the Dover area and then in Rehoboth Beach. They ultimately decided to purchase a condominium in Rehoboth Beach for $220,000. According to Lisa, George Jr. intended that the property be listed in her name alone, but then at her

---

[3] I refer to the town in Kent County, not the western U.S. state.

direction, it was changed to a joint tenancy with right of survivorship in Lisa and George Jr.'s names. George Jr. went to the closing. Testimony from Hal Dukes, Esquire, the real-estate attorney involved in that transaction, was that George Jr. was aware of what he was doing and the estate that would be created, and that such remained his wish, even after Mr. Dukes explained the implications of a joint tenancy with right of survivorship, as opposed to tenancy in common. The exact purpose of the condominium purchase is unclear—whether it was an investment, a trysting place, or both; testimony at trial supported all three possibilities.

At the same time, evidence also supports the fact that, throughout the time she knew George Jr. and was receiving money and property from him, Lisa was still seeing non-party Anthony Tharp,[4] her sometimes live-in boyfriend. In fact, in December 2011, George Jr. paid for Lisa to take a trip to Key West, Florida. The evidence indicates that Lisa told George Jr. the trip would include Lisa, her brother and his wife, and Lisa's son, but this was untrue; in fact, the group was comprised of Lisa and Tharp, together with Lisa's son and a friend of the son.

George Jr. had his first stroke days after Lisa returned from this trip to Key West. A few days passed and he had a second, more significant stroke, after which his physicians found him to be cognitively impaired and unable to make decisions

---

[4] Mr. Tharp's name takes on a number of different spellings in the briefing. I am using the spelling on the title and registration for a 2002 Ford F-15, registered in Lisa's and Mr. Tharp's names. JX 33.

5

for himself.[5]  Shortly after the second stroke, George Jr.'s son George M. Reed III

("George III") consulted with counsel, Beth Miller, Esquire, and, acting as

attorney-in-fact under George Jr.'s 2006 Durable Power of Attorney, created a trust

on George Jr.'s behalf (the "Trust").[6]  The same day the Trust was created, George

Jr.'s interest in the condominium was transferred to George III as trustee for

George Jr.'s Trust.[7]  The deed, however, is signed by George III on a signature line

that says "George M. Reed, also known as George M. Reed, Jr.," which signature

the Respondent contends to be in George III's individual capacity, and the

notarization indicates that "George M. Reed, also known as George M. Reed, Jr."

appeared and signed the document.[8]

George Jr. died on August 31, 2012.

The matter was tried on December 1 and 2, 2014.  The parties then prepared

and submitted written closing arguments.  This is my post-trial Memorandum

Opinion.[9]

## II. ANALYSIS

This case is notable for what the Petitioners do *not* contend.  They do not

argue—and no evidence in the record supports—that George Jr. lacked capacity at

---

[5] *See* JX 11; JX 12.

[6] The Trust Agreement is dated April 16, 2012.  JX 13.

[7] JX 14.  George III, acting as trustee for the Trust, transferred the Trust's interest in the condominium to George III and Scott in December 2013.  *See* JX 15.

[8] JX 14.

[9] Neither party requested preparation of an official transcript in aid of post-trial argument.  The facts are taken from the trial exhibits and testimony as recorded in the unofficial transcript.

6

the time he made the transfers at issue, or that he was a vulnerable to the exercise of undue influence. While the transfers of property to Lisa were lavish, neither Petitioners nor the record suggest that they were sufficient to impoverish, or even financially inconvenience, the relatively wealthy George Jr. Nor do the Petitioners allege that the elements of common-law fraud exist with respect to these transfers. Instead, the Petitioners allege a kind of equitable "fraud" or breach of trust[10] under the theory advanced by this Court in *Swain v. Moore*.[11] That case also involved an elderly widower who lavished gifts, there on a young family, gifts that this Court employed equity to reverse. According to the Petitioners, *Swain* teaches that when an elderly person befriends a younger individual, and acts on that affection by making gifts to her, fraud on her part is presumed, and the burden is on the recipient of the gifts to demonstrate entire fairness in the relationship. *Swain*, itself now elderly, cannot be read this broadly or simplistically, however. I examine the transfers George Jr. made to Lisa, in light of *Swain* and other applicable case law, below.

   *A. The Cash Transfers and the Truck*

   It is useful, I think, to examine what were clearly gifts of cash by George Jr. to Lisa in light of their relationship. Under Delaware law, a gift is made by

---

[10] Lisa argues that the Petitioners did not timely raise breach of trust as a theory in this case, relying instead on a theory of fraud. I assume for purposes of this Memorandum Opinion that breach of trust is properly before the Court.
[11] 71 A.2d 264 (Del. Ch. 1950).

complete and unconditional delivery of property, which requires donative intent, and acceptance of the property by the donee.[12] The donee has the burden of establishing, by clear and convincing evidence, all facts essential to the validity of a purported gift.[13] This burden arises out of the rebuttable presumption, often seen in the context of resulting trusts, that a purchaser of property intends that purchased property to inure to her own benefit.[14] The Petitioners contend that the law of gifts is inapplicable here and is instead overridden by *Swain v. Moore*, under which case Lisa must show that the transfers were entirely fair.

George Jr. was old, but independent both physically and in his financial affairs. He was a wealthy former business owner. Lisa was a relatively young, impoverished single mother waiting tables in a diner. They began a physical romantic relationship that strikes the Petitioners, unsurprisingly, as completely inappropriate, even meretricious.

Lisa testified, without persuasiveness or credibility, that she "loved" George Jr. One cannot know for certain another's deepest emotions, but Lisa was not a credible witness, and I am convinced that, while she was fond of George Jr., her ultimate goal in this relationship was not romantic fulfillment. The Petitioners

---

[12] *Hudak v. Procek*, 806 A.2d 140, 150-51 (Del. 2002).

[13] *Matter of Estate of Smith*, 1986 WL 4873, at *5 (Del. Ch. Apr. 24, 1986).

[14] *Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982); *Boush v. Hodges*, 1996 WL 652762, at *5 n.20 (Del. Ch. Nov. 6, 1996) *aff'd*, 705 A.2d 243 (Del. 1998); *Greenly v. Greenly*, 49 A.2d 126, 129 (Del. Ch. 1946).

point to Lisa's ongoing relationship with Tharp, and argue that, if Lisa did not share a romantic infatuation with George Jr., she has defrauded him. This is a non-sequitur. I conclude that, like Lisa, George Jr. was also receiving what he wanted from this relationship: physical and emotional attention he found flattering and fulfilling, from a much younger partner. If George Jr. had been in his fifties rather than his eighties, and had made lavish but not impoverishing gifts to a much younger romantic partner, I suspect an action of this type would not have been brought, and whatever society concluded about the wisdom of his pursuit, neither law nor equity would reverse his gifts to her. Although the transferee of property without value in exchange bears the burden of showing that the transfer was a gift—that is, made with donative intent—there would be little question that such intent was present. The same is true here: the sole difference is George Jr.'s advanced age. According to the Petitioners, under *Swain,* a presumption of fraud on the part of Lisa attaches given the age difference of the parties.

*Swain* involved an elderly, lonely widower, estranged from his own family, who was befriended by a young couple living nearby. He became very close to the family, especially the wife and their young child, and began making gifts of money to them. Eventually, he paid for construction of part of their new house with the understanding that he could live out his life with them, moved in and became dependent upon them, and made gifts to them by which he impoverished himself.

9

The parties had a falling out and Swain sued to recover the gifts. The Court returned those gifts made after Swain became dependent on the defendants; they were permitted to keep those made before that time.

Properly read, *Swain* is an unremarkable trust case. Swain was emotionally susceptible, and once he became dependent upon the defendants, a confidential relationship arose, a relationship of trust under which the defendants, as fiduciaries, had a duty to act with loyalty to the elderly man. In accepting impoverishing gifts, they violated that trust. Under the rationale of *Swain,* a fiduciary such as the defendants there must show that any transaction with the beneficiary was entirely fair, which the defendants were unable to do with respect to the impoverishing gifts.[15]

Nothing in the case before me indicates a relationship of trust. George Jr. did not rely upon Lisa as his surrogate family; he remained close to his own family and his interest in her was far from paternal. He clearly enjoyed Lisa's company and was flattered by her attention. He was independent of her, however. Unlike the apparent facts of *Swain*, George Jr. had frequent contact with family and friends other than Lisa, and he maintained a social schedule apart from her. His gifts of cash, amounting to several thousand dollars, were lavish but not remotely impoverishing. Similarly, when her car became unusable, he bought her a new

---

[15] By the time the parties parted ways, Swain was left with only title to his house and burial money.

truck; again, lavish but not impoverishing, and not an unusual gift from a wealthy "swain" to a desirable partner. Just as clearly, he was able to set limits on his giving; he made some cash transfers to Lisa that were denominated on the check or George Jr.'s check register as "loans," and Lisa has acknowledged at trial that at least one transfer of money to her was a loan and not a gift. There is simply no basis to infer a relationship of trust with respect to this situation, and *Swain* does not apply. Instead, with respect to the non-"loan" transfers and the truck, the evidence demonstrates clearly and convincingly that these were gifts to Lisa, made with donative intent inspired by George Jr.'s romantic and physical interest in her.[16]

Equity stands ready to protect the vulnerable from exploitation, and it is a sad fact of life that the elderly are often vulnerable to fraud or breach of trust. It would be simple paternalism, however, to suggest that solely because of advanced age, an individual may not indulge in pleasures at his own expense that he finds appropriate, even if that expense appears to others to be foolish or excessive. The Petitioners do not contend that George Jr. was the victim of undue influence,[17] and

---

[16] One of George Jr.'s caregivers, who wrote some of the checks at his direction, colorfully characterized the basis for George Jr.'s donative intent by denominating the checks in the reference line as "grab ass money." *See, e.g.,* JX 28. The record does not reflect that either George Jr. or Lisa objected to this reference.

[17] *See Mitchell v. Reynolds*, 2009 WL 132881, at *8 (Del. Ch. Jan. 6, 2009) ("Proving undue influence requires a challenger to show (1) a person who is subject to undue influence; (2) an opportunity to exert influence; (3) a disposition to exert such influence; and (4) a result indicating the presence of undue influence." (internal citation omitted)). It is not alleged that

11

the record does not support allegations of fraud[18] or breach of trust.[19] Therefore, the relief the Petitioners have requested with respect to cash transfers and the truck is denied, except with respect to those transactions denominated "loan" in the check register or otherwise.[20] These include George Jr.'s pay-off of the Delaware State Housing Authority loan, which by Lisa's own testimony, was not a gift— Lisa testified that she rejected it as a gift and insisted upon repaying it, thus, the acceptance element of a gift is lacking.[21] There were also certain checks on which George Jr. wrote "loan," or so denoted in his meticulously-kept check register.[22]

George Jr. was subject to undue influence or that he was isolated from his friends and family such that there would be opportunity to exert influence.

[18] The elements of a fraud claim are: (1) a false representation, (2) knowledge by the person making such representation that it was false, or reckless indifference to the truth of the statement, (3) an intent, in making such statement, to induce the plaintiff to act or refrain from acting, (4) the plaintiff's action or inaction in justifiable reliance on the representation, and (5) damage. *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000). "The elements of equitable fraud are similar to those for common law fraud, except that the claimant need not show that the respondent acted knowingly or recklessly—innocent or negligent misrepresentations or omissions suffice." *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014) (internal quotation marks omitted). With the exception of statements in connection with the payment for the Key West trip, addressed below, the record is devoid of false statements from Lisa to George Jr.

[19] *White v. Lamborn*, 1977 WL 9612, at *4 (Del. Ch. Mar. 15, 1977) ("[T]he question of whether or not the particular relationship is of such a confidential or dependent nature as to rise to fiduciary status is one of fact.")

[20] *See Hudak v. Procek*, 806 A.2d 140, 150-51 (Del. 2002) ("As a general rule a gift must be executed (a) by the donor's complete and unconditional delivery of the property that is the subject of the gift and (b) by the donee's acceptance of the gift.").

[21] The Respondent objected to the Petitioners' evidence from George Jr.'s personal calendar and notes on hearsay grounds with respect to the pay-off of the SHA loan. I need not rely on that evidence in making my determination that this payment was a loan, as I found Lisa's testimony that she intended to repay it to be sufficient.

[22] *See* JX 5; JX 28. I note that the Respondent objects to the check register on foundation and hearsay grounds. As to foundation, I found George III's testimony that the register was in his father's handwriting to be credible and supported by other documents in the record. As to hearsay, I find the cancelled checks and the check register to fall under hearsay exceptions in

12

Lisa speculated in testimony that George wrote "loan" solely out of habit, testimony I find not credible and belied by other checks to her—which I have found to be gifts—not so denominated. With respect to the checks marked "loan," therefore, Lisa has not shown donative intent and those amounts must be repaid, consistent with the discussion below.

A final transaction requires comment. Lisa asked George Jr. for a gift of money so that she could take her son and brother to Key West for a vacation. Instead, she took her boyfriend and shared a motel room with him. Lisa testified that she disclosed the true nature of the trip to George Jr. at the time he gave her the money, and that a fraudulent caption on a photo she sent him identifying a charter-boat captain as her "brother" was an innocent mistake. This testimony was a concatenation of self-serving lies. Under either a theory that this gift was procured by fraud, or that Lisa has failed to demonstrate donative intent in light of George Jr.'s misapprehension of the facts, all transfers relating to the Key West trip must be returned to George Jr.'s estate.[23]

---

Delaware Rules of Evidence. They are offered to show the lack of donative intent at the time the notations were made, and thus admissible under Rule 803(3). In addition, the records appear to have been kept by George Jr. regularly and meticulously, akin to a business record; thus I find them reliable under Rule 807. At any rate, it is the *Respondent's* burden to show, by clear and convincing evidence, that the elements of a gift are met, including donative intent, and she cannot meet that burden with respect to these sums.

[23] The Petitioners contend that such fraud permeates the entire relationship, but nothing indicates to me that there was a representation, explicit or implicit, that Lisa was committing to a monogamous faithful sexual relationship with George Jr., or that he had reason to rely on such an expectation, in the context of the other gifts.

*B. The Condominium*

As stated above, a transfer of property without consideration to another is presumed to be for purposes of the transferor, and the burden is on the recipient to show donative intent by clear and convincing evidence. The evidence with respect to the condominium must be viewed in light of the relationship between George Jr. and Lisa and the donative intent demonstrated by the gifts discussed above. The facts at trial showed that Lisa and George Jr. enjoyed the Rehoboth area, and started looking at property there as a way to spend time at the beach or as an investment. Lisa was largely responsible for selecting the particular unit George Jr. ultimately purchased. All the funds used to purchase the condo—$220,000— came from George Jr. The lawyer who handled the transaction, Hal Dukes, testified that he explained to George Jr. the difference between tenancy in common and joint tenancy with right of survivorship, that George Jr. understood the difference and that, the age differential notwithstanding, he elected a joint tenancy. According to Dukes, George said that while he understood that the condo would pass to Lisa if he should die, it would, on the other hand, pass to him if Lisa predeceased, a correct statement of the law if also a bad bet. I find that George Jr.'s intent was to make a present gift to Lisa of an undivided interest in the

14

condo.[24] It is undisputed that George Jr. discussed title with counsel, understood what he was doing and chose to create the title—joint, with survivorship—that he did. As a matter of law, the unambiguous title document controls,[25] and, as explained above, the facts do not support equitable relief. The deed creates a joint tenancy between Lisa and George Jr.

That was the state of affairs at the time George Jr. had his second stroke. As of that time, he was incapacitated. George had previously executed a springing durable power of attorney (the "POA") which made both his sons—including George III—attorney-in-fact upon his disability. That disability was certified by George Jr.'s physicians, in writing, first on April 5, 2012, in a handwritten note[26] and then in a physician's affidavit dated June 11, 2012.[27] George III, as fiduciary for his father, sought legal counsel, and hired Beth Miller, Esquire, who advised him, as part of marshalling and protecting his father's assets, to break the unities of the condominium joint title with a transaction out of George Jr.'s one-half interest in the condominium, and into George Jr.'s Trust.[28] George III complied, employing the POA to create a deed which severed the unities and converted the

---

[24] I note Mr. Dukes' testimony that initially he received the impression that the condo would be in titled in Lisa's name alone, but that Lisa called Mr. Dukes shortly before closing and directed him to prepare the deed with Lisa and George, Jr. as joint tenants.
[25] *See, e.g., Mack v. Mack*, 2015 WL 1607797 (Del. Ch. Mar. 31, 2015).
[26] JX 11.
[27] JX 12.
[28] *See* JX 14.

title to the condominium into a tenancy in common owned half by Lisa and half by the Trust.[29]

Lisa makes a number of arguments why this act should not be given cognizance by the Court, all of which are unavailing. She argues that the transfer was an unfaithful act because it did not comply with George Jr.'s intent, that it should be disregarded as a self-dealing act because George III is a remainder beneficiary of the Trust, that it was an invalid exercise of the power of attorney because it was executed by only one of George Jr.'s sons, and that there are technical defects in the deed itself.

To the extent Lisa has standing to raise these issues, they cannot help her. George Jr.'s intent, post-strokes, is unascertainable, and may well have changed had he been cognizant of the new conditions of his life. Marshalling the assets in the Trust or the estate was not self-dealing simply because George III was an heir and beneficiary—the assets so marshaled were available to George Jr. during the remainder of his life. Lisa contends that the transfer is invalid because action under the POA could only be taken by both attorneys-in-fact jointly. This argument relies on the fact that the Durable Power of Attorney appointed George

---

[29] *See Shockley v. Halbig*, 75 A.2d 512, 513 (Del. Ch. 1950) ("One joint tenant can convey his interest and thus destroy the joint tenancy."); *In re Ellingsworth*, 266 A.2d 890, 891–92 (Del. Ch. 1970) ("It has been held that a severance of a joint tenancy may be accomplished by the act, voluntary or involuntary, of either of the joint tenants. . . . [A] joint tenancy in land is an interest which can be sold at the option of either joint tenant, including a guardian of such a tenant, although the practical effect of such a sale is to destroy the joint tenancy itself.").

III and Scott as "attorney-in-fact," in the singular. Lisa points out that under 12 *Del. C.* § 49A-111(b), joint agents, when so designated, may not act independent of one another; therefore, she argues, the act by George III alone was invalid.[30] The Durable Personal Powers of Attorney Act, however, was enacted *after* George Jr. entered into the POA, and does not apply here.[31] Lisa has not argued, and I do not understand, that anything in the common law would invalidate the transfer on this ground. The Respondent also argues that the transfer was effectively a gift to George III and Scott, and was outside the authority granted by the Power of Attorney. I find, however, as noted above, that the transfer was made for George Jr.'s benefit and that it was within the scope of the Power of Attorney. Finally, in light of my finding that George III was acting as George Jr.'s attorney-in-fact, any

---

[30] The Respondent also argued at one time that the power of attorney did not become effective because George III did not have a physician's certificate declaring George Jr.'s incapacity at the time of the deed. But this issue was not raised in post-trial briefing, and, as such, I deem that it has been waived. At any rate, one of his physicians indicated by written note on April 5, 2012 that he was "unable to make informed decisions at [that] time." *See* JX 11.

[31] The Petitioners cite to 12 *Del. C.* § 49A-106(b) ("A personal power of attorney executed before October 1, 2010, is validly executed if it complied with the laws of this State as they existed at the time of execution, unless such personal power of attorney provides that it is governed by the laws of another jurisdiction, in which case, such personal power of attorney is validly executed if such execution complied with the laws of such other jurisdiction."). Further to the point, even if the statute applied, 12 *Del. C.* § 49A-111 indicates that concurrent agents may act independently. Subsection (c) provides that, if the principal designates more than one agent and does not specify whether they are concurrent or joint agents that they are considered concurrent agents. Even if the statute applied, given the language used, George III and Scott would be concurrent agents.

17

defects in the deed, which destroyed the joint tenancy and created a tenancy in common, are clearly scrivener's errors subject to reformation.[32]

Since the time the tenancy in common was created, Lisa and the Trust have each owned an undivided half interest in the condo. The Trust seeks a partition and accounting. Unless the parties agree otherwise, the condo must be sold at public vendue.[33] The net proceeds must be adjusted to account for payments made by Lisa that resulted in a benefit to the tenancy, if any, and Lisa must account for rent she has received. Before distribution, the face amount of the loans George made to Lisa,[34] and amounts paid by George Jr. in connection with the Key West trip, together with post-judgment legal interest, should be deducted from Lisa's share, and paid to George Jr.'s estate. The parties should agree on these sums; otherwise, I will resolve the matter for them. The remainder should be distributed to Lisa and the Trust in equal parts.

### III. CONCLUSION

---

[32] The defects alleged are that the executing party is identified as George Jr., but the deed was signed by George III without indication that he was acting as attorney-in-fact. The notarization also provided that George Jr. executed the deed.

[33] *See* 25 *Del. C.* § 729.

[34] *See* JX 5; JX 28. In reviewing the check register and copies of cancelled checks, I understand George Jr. to have made cash loans to Lisa in the amount of $5,000, not including payoff of the DSHA loan, which must also be repaid. JX 5 indicates check number 5201 to Lisa Grandelli for $4,000 was a "loan." JX 28, on the page marked as Grandelli 16, shows the same check, number 5201, and indicates "loan" on the memo line. JX 5 shows that check number 12, which I find to mean check number 5212, from the numerical order followed in the check register, dated 12/26, is indicated as "cash-loan" in the amount of $1,000. JX 28 on the page marked Grandelli 17 shows that check, number 5212, in the amount of $1,000 dated 12/26 was payable to Lisa Grandelli.

George Jr.'s heirs are upset that in the last months of his life, their father lavished expensive gifts on a much younger woman. Their position is natural; frankly, this is a case that was neither a pleasure to hear or write on. As a competent individual, however, George Jr.'s choices were his to make. Lisa, on the other hand, has treated as her own a condominium unit owned in common with George, Jr.'s Trust, for which she must account. In addition, loans made to her by George Jr. must be repaid, together with amounts to pay for the Key West trip, which she received based on false representations. The parties should submit an appropriate form of order. Each party must bear its own fees and costs.